UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.                                              20 Cr. 500 (JGK)

ARTHUR HAYES, BENJAMIN DELO,
SAMUEL REED and GREGORY DWYER,

*Defendants*.

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANTS' MOTION FOR A BILL OF PARTICULARS</u>**

**TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ........................................................................................1

II.     BACKGROUND ........................................................................................................3

        A.      The Indictment..........................................................................................3

        B.      The Defense Has Sought Particulars from the Government...................................6

III.    ARGUMENT ............................................................................................................8

        A.      Applicable Law...........................................................................................8

        B.      The Government Must Provide Particulars Regarding the U.S. Customers
                that Defendants Allegedly Allowed to Access BitMEX's Platform.......................8

        C.      The Government Must Provide Particulars About the Alleged Marketing
                Activities Directed to U.S. Customers .................................................................12

        D.      The Government Must Provide Particulars Regarding the Steps BitMEX
                Needed to Take to Be Exempted from U.S. Laws and Identify the Policies,
                Procedures, Rules, Regulations, or Statutes BitMEX Failed to Follow to
                Avoid CFTC Registration Requirements............................................................13

        E.      The Government Must Particularize the Basis for the Allegation That
                BitMEX Was an FCM that Each Defendants Knew Was Required to
                Register with the CFTC ....................................................................................16

        F.      The Government Must Provide Particulars About the Alleged Falsification
                of BitMEX Records and Purported Failures to Take Steps to Deactivate
                Accounts of U.S. Customers..............................................................................18

        G.      The Government Must Identify the Alleged Co-Conspirators .............................19

IV.     CONCLUSION........................................................................................................21

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bryan v. United States*,
 524 U.S. 184 (1998) ............................................................................................... 15

*Sam Wong & Son, Inc. v. New York Mercantile Exch.*,
 735 F.2d 653 (2d Cir. 1984) .................................................................................. 15

*United States v. Ajemian*,
 2012 WL 6762011 (E.D.N.Y. Dec. 27, 2012) ...................................................... 21

*United States v. Bonventre*,
 2013 WL 2303726 (S.D.N.Y. May 28, 2013) ....................................................... 11

*United States v. Bortnovsky*,
 820 F.2d 572 (2d Cir. 1987) ................................................................................ 8, 9

*United States v. Chen*,
 378 F.3d 151 (2d Cir. 2004) ................................................................................... 8

*United States v. Henry*,
 888 F.3d 589 (2d Cir. 2018) ................................................................................. 15

*United States v. Ikoli*,
 2017 WL 396681 (S.D.N.Y. Jan. 26, 2017) .......................................................... 11

*United States v. Kahale*,
 789 F. Supp. 2d 359 (E.D.N.Y. 2009) ...................................................... 11, 20, 21

*United States v. Kanekar*,
 2020 WL 730353 (E.D.N.Y. Feb. 12, 2020) ............................................. 14, 16, 21

*United States v. Murgio*,
 209 F. Supp. 3d 698 (S.D.N.Y. 2016) ....................................................... 14, 15, 18

*United States v. Nachamie*,
 91 F. Supp. 2d 565 (S.D.N.Y.2000) .......................................................... 11, 19, 20

*United States v. Nekritin*,
 2011 WL 1674799 (E.D.N.Y. May 3, 2011) ......................................................... 12

*United States v. Pirro*,
 212 F.3d 86 (2d Cir. 2000) .................................................................................... 18

*United States v. Rajaratnam,*
    2010 WL 2788168 (S.D.N.Y. July 13, 2010) ........................................................ 8, 10

*United States v. Ratzlaf,*
    510 U.S. 135 (1994) ............................................................................................. 17

*United States v. Rigas,*
    490 F.3d 208 (2d Cir. 2007) ................................................................................. 8

*United States v. Schlegel,*
    2009 WL 10673617 (E.D.N.Y. Jan. 26, 2009) ..................................................... 19

*United States v. Silver,*
    117 F. Supp. 3d 461 (S.D.N.Y. 2015) ................................................................... 9

*United States v. Stein,*
    435 F. Supp. 2d 330 (S.D.N.Y. 2006) ................................................................... 21

*United States v. Upton,*
    856 F. Supp. 727 (E.D.N.Y. 1994) ....................................................................... 19

*Waraich v. Nat'l Australia Bank Ltd.,*
    2019 WL 2296795 (S.D. Tex. May 30, 2019) ....................................................... 15

**Statutes**

31 U.S.C. § 5311 ......................................................................................................... 4

31 U.S.C. § 5318 ......................................................................................................... 4

31 U.S.C. § 5322 ......................................................................................................... 4

**Rules and Regulations**

Fed. R. Crim. P. Rule 7(f) ........................................................................................... 1, 8

31 C.F.R. § 1026.210 ................................................................................................... 4

31 C.F.R. § 1026.220 ................................................................................................... 4

Defendants Arthur Hayes, Benjamin Delo, and Samuel Reed (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure for an Order requiring the government to provide a bill of particulars.

## I.    PRELIMINARY STATEMENT

As alleged in the Indictment, Defendants are the co-founders of a company incorporated abroad which operated an offshore trading platform called BitMEX.  (Indictment ¶¶ 9, 13-15, ECF No. 2.)  The charges in the Indictment are premised upon a novel application of the Commodity Exchange Act ("CEA") and the Bank Secrecy Act ("BSA") to a foreign trading platform.  The Indictment's central theory is that, despite organizing in a foreign jurisdiction and withdrawing from the U.S. market in September 2015, BitMEX was nonetheless required to register with the Commodity Futures Trading Commission ("CFTC") as a futures commission merchant ("FCM") because BitMEX allegedly sought and served "thousands" of customers located in the United States.  (*Id.* ¶¶ 2-3, 17.)  The Indictment alleges that Defendants willfully caused BitMEX to fail to comply with the BSA's requirements for FCMs to implement adequate anti-money-laundering ("AML") and know-your-customer ("KYC") programs.

The Indictment does not allege or explain what measures BitMEX, having publicly announced its withdrawal from the U.S. market as of the beginning of the Indictment period in September 2015 (*see id.* ¶ 28), was supposed to deploy, or what rules BitMEX needed to follow, to appropriately remain outside of the United States and avoid the application of U.S. law. Instead of crediting BitMEX's efforts to identify and block U.S. customers, and without describing the specific legal standard that BitMEX was required to meet in order to avoid triggering the evolving requirements of U.S. jurisdiction, the Indictment's central theme is that BitMEX should have "done more"—while at the same time asserting that any "affirmative steps"

1

already taken somehow evidence a willful violation of U.S. law.  In six different respects, the Indictment omits crucial details necessary for Defendants to understand the nature of the charges against them and prepare a defense.

*First*, the Indictment does not identify the "thousands of customers located in the United States" that Defendants allegedly permitted to trade (*id.* ¶ 2), nor does the Indictment provide evidence that Defendants knew that any such customers were, in fact, U.S. customers during the time that they were trading.  None of the internal records referenced in the Indictment show that Defendants actively sought U.S. users or knew in real time of trades by "thousands of customers" in the United States who circumvented BitMEX's controls and gained access in violation of the company's Terms of Service.

*Second*, although the Indictment alleges that BitMEX "engaged in marketing activities with the effect and intent of attracting U.S. customers" (*id.* ¶ 29), the government fails to identify any potential or existing U.S. customers to whom Defendants allegedly marketed.  The government has not identified a single meeting with a U.S. customer in the United States, or otherwise.  When it attempted to identify U.S. television appearances to satisfy Defendants' bill of particulars demands, the government referenced a single document that catalogued television appearances where a Defendant expressly *disclaimed* accepting U.S. customers.

*Third*, the Indictment cites a single action—incorporation in the Seychelles—as an example of an "affirmative step" taken to avoid U.S. law.  (*See id.* ¶ 21.)  But other than this lawful and routine act, the government has not identified any other "affirmative steps" that BitMEX allegedly took to avoid being subject to U.S. law and how such steps support any inference of knowledge of the alleged KYC and AML obligations.  Since "affirmative steps" to exempt BitMEX from the application of U.S. law would presumably support the government's

theory of willfulness, it is essential to understand the particulars of this allegation.  Similarly, the government has not identified any specific legal standards that BitMEX was required to meet in order to avoid becoming subject to CFTC regulatory obligations.

*Fourth*, the alleged BSA violations are predicated on BitMEX's alleged status as an FCM.  The government must therefore provide particulars for both the specific attributes of BitMEX's business that purportedly made it an FCM, as well as the basis for Defendants' knowledge that such attributes triggered any BSA obligations.  Given the highly technical and non-intuitive derivatives trading regulatory framework in the United States, these matters are not self-evident.  Nor is the government's mere recitation of the statutory definition of an FCM (*see id.* ¶ 6) sufficient to inform Defendants of the nature of the charges.

*Fifth*, the government has not provided details about the records that Defendants allegedly falsified to obscure the location of U.S. customers.  Nor has the government identified the known U.S. customers that Defendants allegedly failed to deactivate.  Given that "thousands" of U.S. customers are alleged to have traded on the platform, Defendants are hampered in their preparation for trial and face unfair surprise without notification of all the records that Defendants allegedly falsified and the accounts that Defendants allegedly failed to deactivate.

*Finally*, Defendants are entitled to know the identity of the unnamed co-conspirators.  In complex conspiracy cases like this one, which involves an alleged conspiracy that spans five years across the globe, the risk of unfair surprise and the ability to prepare a defense far exceed any government interest in withholding this vital information.

## II.      BACKGROUND

### A.      The Indictment

On September 21, 2020, the Grand Jury returned a two-count Indictment against Defendants Arthur Hayes, Benjamin Delo, Samuel Reed, and Gregory Dwyer.  The Indictment

alleges that Defendants Hayes, Delo, and Reed founded BitMEX in or about January 2014 and registered the entities that own and operate BitMEX in the Seychelles.  (*Id.* ¶¶ 9-10.)  Defendant Dwyer is alleged to be the company's first non-founder employee, who joined the company in late 2015.  (*Id.* ¶ 12.)

Count One of the Indictment charges Defendants with "willfully caus[ing]" BitMEX to violate the BSA, 31 U.S.C. § 5311, *et seq*. by "failing to establish, implement, and maintain" an AML program that satisfied the requirements of 31 U.S.C. §§ 5318 and 5322, and 31 C.F.R. §§ 1026.210 and 1026.220.  (*Id.* ¶ 30.)  Count Two of the Indictment charges Defendants with "willfully and knowingly" conspiring to cause BitMEX to violate the BSA, 31 U.S.C. §§ 5318 and 5322, and 31 C.F.R. §§1026.210 and 1026.220.  (*Id.* ¶ 32.)  Both counts rely on the classification of BitMEX as an FCM.  (*Id.* ¶¶ 3, 5-8, 18; *see also* Aug. 11, 2021 Tr. at 36-37, ECF No. 117 (AUSA Greenwood) ("[T]he subset of the BSA we are dealing with and the reason that BitMEX is a covered financial institution is because it is an entity required to register as a *futures commission merchant* with the CFTC under the Commodity Exchange Act.  So, certainly, establishing the fact that BitMEX had to register with the CFTC and had a regulatory registration obligation is *a prerequisite to our charges*.") (emphasis added).)

The Indictment alleges that, under the CEA, an entity is required to register with the CFTC as an FCM if it "solicits or accepts orders for commodity futures contracts, swaps, or retail commodity transactions . . . and in or in connection with such activity accepts any money or property to margin, guarantee, or secure any trades or contracts that result or may result therefrom."  (Indictment ¶ 6.)  The BSA, in turn, imposes reporting, recordkeeping, and controls requirements on FCMs as "covered 'financial institutions.'"  (*Id.* ¶ 5.)  One of the BSA's requirements is that an FCM establish an adequate AML program, including an adequate KYC

program.  (*Id.* ¶¶ 4, 7-8.)  Despite acknowledging that BitMEX withdrew from the U.S. market and banned U.S. customers in or about September 2015 (*id.* ¶¶ 2, 28, 33(b)), the Indictment alleges that BitMEX was still required to register with the CFTC as an FCM and implement a BSA-compliant AML and KYC program based on the following allegations:

*First*, the Indictment alleges that BitMEX actively sought and served "thousands of customers located in the United States" (*id.* ¶ 2) and that each of the Defendants "actively encouraged or allowed BitMEX to be accessed and used by U.S. customers, and failed to take steps to effectively restrict U.S. customers from accessing BitMEX."  (*Id.* ¶ 25.)  The Indictment provides two instances where Defendant Delo, and one instance where Defendant Reed, allegedly allowed individual U.S. users to access BitMEX.  (*Id.* ¶ 26.)  The Indictment uses these anecdotes to allege broadly that Defendants failed to take steps to deactivate accounts of U.S. customers and falsified records.  (*Id.* ¶¶ 26, 33(b).)

*Second*, the Indictment suggests that the Company's IP address check, which sought to prevent U.S. users from obtaining an account to access the platform, was not good enough.  (*Id.* ¶ 28.)  The Indictment states that Defendants "well knew" and "intended" that BitMEX apply the IP check on just a single occasion for each customer.  (*Id.*)  The single IP check, according to the Indictment, allowed U.S. customers to circumvent the controls by showing a "non-U.S. IP Address for the IP Address Check . . . [and] thereafter access and trade on BitMEX's platform from U.S. IP Addresses."  (*Id.*)  The Indictment clarifies that U.S. users "circumvented the IP Address Check" by using a virtual private network ("VPN"), which "ma[de] it appear as though [the user was] accessing BitMEX from outside the United States."  (*Id.*)  The Indictment alleges that Defendants allegedly knew that U.S. customers were circumventing BitMEX's controls and "caused BitMEX to take no steps to restrict access . . . via [VPNs]."  (*Id.*)

*Third*, the Indictment claims that BitMEX engaged in marketing activities with the "effect and intent of attracting U.S. customers." (*Id*. ¶ 29.) The only marketing activity that is alleged to involve "potential and existing customers based in the U.S." are purported "meetings in the United States." (*Id*.) But no specific meetings with U.S.-based customers in the United States—or anywhere else—are identified in the Indictment.

*Fourth*, the Indictment suggests that the "affirmative steps" Defendants caused BitMEX to take that were "designed to exempt BitMEX from the application of U.S. laws" fell short. (*Id*. ¶ 21.) The Indictment identifies only the incorporation of the entity operating BitMEX in the Seychelles as an "example" of one such step (*see id.*), but does not cite a single rule, regulation, statute, or law requiring BitMEX to meet any particular legal standard to maintain its status as a foreign trading platform exempt from the CFTC's jurisdiction or the application of U.S. law in general. Instead, the Indictment maligns the largely unidentified "affirmative steps" BitMEX took to withdraw from the U.S. market and uses those same actions as a basis to claim that Defendants "willfully caused BitMEX to reject adoption or implementation of BSA-compliant AML and KYC programs." (*Id*. ¶ 22.) Absent from the Indictment is information about each Defendant's knowledge of the alleged thousands of U.S. users circumventing BitMEX's controls to trade on the platform, involvement in specific marketing activities directed to U.S. customers, or knowledge that BitMEX was an FCM under the CEA that was required to register with the CFTC.

**B.    The Defense Has Sought Particulars from the Government**

Defendants have, in connection with serving discovery demands, sought particulars concerning the Indictment's many vague and general allegations. (Ex. A (March 22, 2021 Delo

Discovery Ltr.); Ex. B (Apr. 19, 2021 Hayes Discovery Ltr.).)[1]  Their requests for a bill of particulars sought information that is necessary for Defendants to understand the charges against them and mount a defense.  Specifically, Defendants sought, among other things:

- Particulars about the U.S. customers that Defendants allegedly allowed to access the platform.  (*See* Ex. A (Delo Bill of Particulars ("BoP") Req. Nos. 1, 3, 7, 13); Ex. B (Hayes BoP Req. Nos. 1, 3, 8, 10, 14, 16, 18).)

- Particulars about the marketing activities that Defendants are alleged to have engaged in with potential and existing U.S. customers.  (Ex. B (Hayes BoP Req. Nos. 11-13).)

- Particulars about the steps BitMEX allegedly should have taken to avoid U.S. laws as well as particulars about the policies, procedures, rules, regulations, or statutes BitMEX failed to follow to avoid having to register with the CFTC.  (Ex. A (Delo BoP Req. Nos. 4, 15, 17); Ex. B (Hayes BoP Req. Nos. 4, 15, 18).)

- Particulars about the alleged falsification of records and alleged failure to deactivate accounts of U.S. users.  (Ex. A (Delo BoP Req. Nos. 8-10, 14); Ex. B (Hayes BoP Req. No. 18).)

- The identities of the alleged co-conspirators.  (Ex. A (Delo BoP Req. Nos. 20-21); Ex. B (Hayes BoP Req. Nos. 21-22).)

On May 7, 2021, the government responded to Defendants' requests.  (Ex. C (May 7, 2021 Gov't Resp. to Delo Discovery Ltr.); Ex. D (May 7, 2021 Gov't Resp. to Hayes Discovery Ltr.).)  The government stated that there was "no legal basis" for the bill of particulars request and disclaimed any obligation to provide particulars.  (*Id.*)  Instead, the government simply responded to certain requests by citing a noncomprehensive list of Bates numbers and Bates ranges for approximately 100 documents in the government's productions without any further context or explanation.  (*Id.*)  The government's response falls short of providing sufficient information to allow Defendants to understand the charges against them and prepare for trial.

---

[1] References to "Ex." refer to the exhibits to the Declaration of Andrew J. Rodgers in Support of Defendants' Motion for a Bill of Particulars.

## III.    ARGUMENT

### A.    Applicable Law

Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars "in order to identify with sufficient particularity the nature of the charge pending against him."  *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (finding the failure to grant a bill of particulars impaired the defendant's preparation of his defense, which constituted reversible error).  "Such a bill 'enables a defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense.'"  *United States v. Rajaratnam*, 2010 WL 2788168, at *1 (S.D.N.Y. July 13, 2010) (quoting *United States v. Rigas*, 490 F.3d 208, 237 (2d Cir. 2007)).

An order for a bill of particulars is appropriate when the charges of an indictment are "so general that they do not advise the defendant of the specific acts of which he is accused." *Rajaratnam*, 2010 WL 2788168, at *1 (quoting *United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004)).  While the government can discharge its obligation of sufficiently notifying a defendant of the charges against him by providing the information either through the indictment "or in some acceptable alternate form," it cannot fulfill this obligation "by providing mountains of documents to defense counsel" without providing guidance as to which documents are relevant and in what manner.  *Bortnovsky*, 820 F.2d at 574-75.

### B.    The Government Must Provide Particulars Regarding the U.S. Customers that Defendants Allegedly Allowed to Access BitMEX's Platform

The BSA charges against Defendants hinge on the claim that BitMEX served "thousands of customers located in the United States" and that each Defendant knew about it, facilitated it, and failed to take steps to effectively restrict U.S. customers.  (Indictment ¶¶ 2, 18, 25.)  Yet, the government has only provided undated anecdotes of three U.S.-based customers who were

allegedly permitted on the platform.  (*Id.* ¶ 26.)  Beyond this limited allegation, the Indictment

refers generally to internal reports that showed accounts with U.S. location information that

"were enabled for trading" (*id.* ¶ 17) and internal reports which "tracked and reported trading

revenue by country" and "showed" that U.S. customers may have traded on BitMEX's platform.

(*Id.* ¶ 27.)  However, and crucially, the Indictment does not allege that any users listed on these

reports traded on the platform at a time when the purported U.S. location information was known

to Defendants, much less provide any factual particulars to support the claim that "thousands" of

U.S. customers traded on the platform with each Defendant's approval.  In order to prepare a

defense, Defendants need to know which U.S. customers supplied the purported jurisdictional

basis for the government to bring the BSA-related charges in the Indictment.

Absent details about the U.S. customers that the government claims each Defendant knew

about and permitted to trade on the platform, the burden impermissibly shifts to Defendants to

determine, over a five-year period, which of the unspecified "thousands" of alleged U.S.

customers the government alleges to have traded on the platform.  *See Bortnovsky*, 820 F.2d at

574-75 (bills of particulars were necessary where the burden of proof was "impermissibly . . .

shifted" to defendants because "defense counsel . . . were left unguided as to which documents

would be proven falsified"); *United States v. Silver*, 117 F. Supp. 3d 461, 471 (S.D.N.Y. 2015)

("Given the exceptional volume of mailings and wire transmissions in this case, the potentially

relevant communications could easily number in the hundreds or thousands," such that "it is not

unreasonable for the Defendant to want to know which mailings and wire transmissions the

Government will rely upon to prove its case.").  The burden and prejudice here is amplified by

the methods the government alleges that U.S. customers used to access the platform.  According

to the Indictment, U.S. customers accessed the platform using VPNs to disguise their location.

(Indictment ¶ 28.)  Since the use of a VPN is not itself unlawful, without the requested particulars Defendants would have to guess which of thousands of transactions the government plans to use to prove that U.S. customers circumvented BitMEX's controls by using VPNs to trade on the platform.

The need for particulars about the U.S. customers is heightened by the length of time—over a five-year period (*id.* ¶¶ 2, 25, 28, 32)—the Indictment claims that Defendants conspired to allow U.S. customers to access the platform while willfully causing BitMEX to fail to adopt or implement a BSA-compliant AML and KYC program.  *Rajaratnam*, 2010 WL 2788168, at *2 ("[I]n complex conspiracy cases . . . , the potential for unfair surprise and the difficulty of preparing a defense are amplified.").  Without particulars about the alleged U.S. customers, Defendants would be left to parse thousands of records spanning this five-year period to guess which customers the government will attempt to use as a basis to prove that the BitMEX platform needed to be registered with the CFTC and satisfy the BSA's AML and KYC obligations.

The government's disclosures to date do not remedy the need for a bill of particulars; in fact, they reinforce why additional particulars are necessary.  The government has pointed without explanation to spreadsheets containing thousands of transaction records, third-party subpoena returns, and documents that have no apparent relationship to Defendants' underlying request.  (Ex. C at 2; Ex. D at 2.)  This disclosure obscures the nature of the charges against each Defendant, which rest on specific knowledge of U.S. customers and the active solicitation of them.  (Indictment ¶¶ 2, 17, 21, 25-30, 32.)  Indeed, the government's response does nothing to remedy "the quintessential 'needle in a haystack' problem" Defendants face because they still have to sift through "thousands of legitimate transactions in an attempt to discover which

transactions the government" claims to have allegedly made the platform's operations unlawful. *United States v. Kahale*, 789 F. Supp. 2d 359, 376 (E.D.N.Y. 2009); *see also United States v. Nachamie*, 91 F. Supp. 2d 565, 571-72 (S.D.N.Y.2000) (granting bill of particulars where government had produced 200,000 documents relating to 2,000 Medicare claims, but had not told the defendants which claims were alleged to be false); *United States v. Ikoli*, 2017 WL 396681, at *5 (S.D.N.Y. Jan. 26, 2017) (finding insufficient notice to defendants warranting additional disclosures and guidance from the government where "the indictment states that 'the defendants created and cashed fraudulent checks to obtain funds to which they were not entitled,' but it does not identify any specific checks or transactions").

Finally, in the event that the Court is disinclined to grant Defendants' request, the Court should, in the alternative, direct the government to produce a list of exhibits and copies of the exhibits it will use to prove its basis to bring the BSA charges no later than 30 days before trial. The government's opaque response fails to identify the "thousands" of U.S. customers whom Defendants allegedly permitted to trade while knowing that the customers were in the United States. In analogous circumstances, the court in *United States v. Bonventre* ordered the government "to produce a list of exhibits and copies of the exhibits that it will use to prove the charges in th[e] case no later than 60 days before the commencement of trial." 2013 WL 2303726, at *7 (S.D.N.Y. May 28, 2013). The court reasoned that such disclosure was warranted given the generic categories of documents listed in the indictment, the fact that charges in the indictment span multiple years, and "the sheer volume of documents at issue in th[e] case." *Id.*

**C.      The Government Must Provide Particulars About the Alleged Marketing Activities Directed to U.S. Customers**

The Indictment claims that, despite banning U.S. users and withdrawing from the U.S. market in or about September 2015 (Indictment ¶¶ 2, 28, 33(b)), BitMEX engaged in "marketing activities with the effect and intent of attracting U.S. customers." (*Id.* ¶ 29.) The only direct U.S. touchpoints that the Indictment mentions are "cryptocurrency conferences in New York and elsewhere in the United States," "meetings in the United States with potential and existing customers based in the U.S.," and unspecified "appearances on U.S. television shows." (*Id.*) Conferences, meetings, and television appearances can occur anywhere in the world, including the United States, without constituting marketing activities directed at U.S. customers. Without particularized allegations about the specific activities that support the government's claim, Defendants cannot mount a defense to claims that they specifically targeted U.S. customers with marketing activities. *United States v. Nekritin*, 2011 WL 1674799, at *8 (E.D.N.Y. May 3, 2011) (granting bill of particulars where defendants were left "to defend legitimate claims unrelated to the conspiracy charge").

The government's inadequate attempt to satisfy Defendants' bill of particular demands underscores why particularized details about BitMEX's marketing activities are needed. For example, the government cited only two email chains in response to the request that the government identify the potential and existing U.S. customers with whom BitMEX met in the United States. (Ex. D at 3 (Gov't Resp. to Hayes BoP Req. No. 11).) Neither email chain references a specific meeting in the United States, let alone a meeting with a potential or existing U.S. customer. (Ex. E (US_00101185); Ex. F (US_00177010).)

Then, in response to Defendants' request that the government identify the specific appearances that Defendant Hayes made on U.S. television shows, the government cited a single

email chain compiling a "media pack" where Defendant Hayes is quoted as saying that "BitMEX does not accept US persons as clients."  (Ex. D at 4 (referencing Ex. G (US_00789780).)  The email does not show a single instance of a U.S. television appearance where Defendant Hayes promoted BitMEX "with the effect and intent of attracting U.S. customers."  (Indictment ¶ 29.)

Given these inadequate responses, the government should identify the U.S. customers with whom any BitMEX representatives are alleged to have met, as well as identify television appearances where Defendants allegedly marketed BitMEX to U.S. users.  These particulars are necessary for Defendants to understand and challenge the government's claim that BitMEX engaged in marketing activities intended to attract U.S. customers.

> **D.    The Government Must Provide Particulars Regarding the Steps BitMEX Needed to Take to Be Exempted from U.S. Laws and Identify the Policies, Procedures, Rules, Regulations, or Statutes BitMEX Failed to Follow to Avoid CFTC Registration Requirements**

Because neither operating a foreign platform exempt from U.S. law nor incorporating in the Seychelles is unlawful conduct, Defendants asked the government to identify "all 'affirmative steps' referenced in paragraphs 21 and 22 . . . that Defendant[s] took that were 'designed to exempt BitMEX from the application of U.S. laws . . . .'"  (Ex. A at 5 (Delo BoP Req. No. 4); Ex. B at 6 (Hayes BoP Req. No. 4).)  In response, the government relied on the single, lawful act of incorporating in the Seychelles as a so-called "example[]" of the "affirmative steps" taken to avoid U.S. laws.  (Exs. C, D at 2.)  At other points, moreover, the Indictment acknowledges that BitMEX withdrew from the U.S. market, banned U.S. users, and implemented IP address check controls "designed to identify and block customers located in the United States from trading on BitMEX."  (Indictment ¶¶ 2, 28, 33(b).)  What remains unknown, and necessary for Defendants to understand the nature of the charges against them, is why these steps were deficient, or what other unidentified steps Defendants were supposed to follow to

restrict U.S. customers and exempt BitMEX from the application of U.S. law. Without this information, Defendants have no way of knowing where the government draws the line between legitimate conduct aimed at avoiding U.S. laws and unlawful conduct that subjected Defendants to U.S. criminal liability.

Because of the ambiguity between legitimate conduct and conduct the government claims to be unlawful, Defendants asked the government to:

> particularize the allegations regarding the policies, procedures, rules, regulations, or statutes that Defendant[s] and/or BitMEX failed to follow to avoid the CFTC registration requirement referenced in paragraphs 6 and 18 of the Indictment and the AML and KYC requirements referenced in paragraphs 4, 7, 8, 21, 22, 24, 25, 30, and 32 of the Indictment.

(Ex. A at 6 (Delo BoP Req. No. 15); Ex B at 7 (Hayes BoP Req. No. 15).) The government declined to provide a response to this request, electing instead to "direct[] [Defendants] attention to the documents referenced in the above bullet points" of the government's letter. (Exs. C, D (Gov't BoP Resp. at 4).) This response is insufficient to enable Defendants to prepare a defense. *United States v. Murgio*, 209 F. Supp. 3d 698, 705, 720 (S.D.N.Y. 2016) (granting motion requesting "a list of the laws or duties [the defendant] allegedly intended to violate"); *see also United States v. Kanekar*, 2020 WL 730353, at *6 (E.D.N.Y. Feb. 12, 2020) (granting Defendant's "motion to identify the specific Medicare and Medicaid provisions that [the defendant] is alleged to have violated with regards to the provision of medical services").

On this score, *United States v. Murgio* is instructive. 209 F. Supp. 3d at 705, 720. There, one of the defendants was the chairman of the board of a credit union who was accused of accepting bribes to assist a co-defendant to obtain control of the credit union's operations. *Id.* at 720. The defendant moved for "a bill of particulars to identify the laws or duties he intended to violate when he allegedly accepted bribes." *Id.* While the government told the defendant that it

14

intended to establish at trial that the defendant violated National Credit Union Administration

("NCUA") regulations, it declined "to specify *which* NCUA regulations [the defendant] may

have violated." *Id.* The court recognized that the Indictment "le[ft] open important questions as

to which of [the defendant's duties as a board chairman he] allegedly violated," and ordered the

government to provide a bill of particulars "with respect to those laws, regulations, and duties."

*Id.*

The need for additional particulars is even more critical here given that the two charges in

the Indictment rely on a combination of two highly technical sets of statutes and regulations—the

BSA and the CEA. Courts have long recognized the complexity of the rules and regulations

governing commodities markets. *See Sam Wong & Son, Inc. v. New York Mercantile Exch.*, 735

F.2d 653, 661 (2d Cir. 1984) (observing that the CEA "has been accurately described as a

'comprehensive regulatory structure to oversee the volatile and esoteric futures trading

complex'"); *Waraich v. Nat'l Australia Bank Ltd.*, 2019 WL 2296795, at *8 (S.D. Tex. May 30,

2019) ("The United States laws and regulations governing commodity markets . . . are

complex.").

Courts have also recognized that the government must show "[k]nowledge of the specific

law that one is violating" where, as here, "a highly technical statute . . . prohibits apparently

innocent conduct." *United States v. Henry*, 888 F.3d 589, 598-99 (2d Cir. 2018); *see also Bryan

v. United States*, 524 U.S. 184, 194 (1998) (observing that the BSA is a "highly technical

statute[] that present[s] the danger of ensnaring individuals engaged in apparently innocent

conduct"). This same concern about well-intentioned violations of criminal statutes with a

complicated regulatory scheme compelled the court in *Kenekar* to grant the defendant's motion

"to identify the specific Medicare and Medicaid provisions that [she was] alleged to have

violated with regards to the provision of medical services." 2020 WL 730353, at *6. The court observed that "the laws surrounding Medicaid and Medicare are extraordinarily complex" such that, "without additional information, [the defendant] may not fully understand the charges against her." *Id.*

The same reasoning applies to the CEA and BSA here. Without additional information about the policies, procedures, rules, regulations, or statutes that BitMEX failed to follow to avoid triggering CFTC registration requirements, the Indictment fails to provide adequate notice about the government's view of how a foreign trading platform could be deemed an FCM under the CEA and how the "affirmative steps" the Defendants caused BitMEX to employ to stay outside the U.S. market allegedly fell short. Indeed, the government appears to rely on a circular theory (found nowhere in the law) that in order for BitMEX to be exempted from the BSA's KYC requirements because it operated outside of U.S. jurisdiction, BitMEX first had to comply with those same KYC requirements to identify and exclude U.S. persons from its platform. The government's failure to particularize the requested information underscores this circularity in its theory of prosecution.

### E. The Government Must Particularize the Basis for the Allegation That BitMEX Was an FCM that Each Defendants Knew Was Required to Register with the CFTC

As the government has acknowledged, BitMEX's alleged FCM status is a necessary "prerequisite" to the criminal charges. (8/11/2021 Tr. at 36-37 (AUSA Greenwood) ("[T]he subset of the BSA we are dealing with and the reason that BitMEX is a covered financial institution is because it is an entity required to register as a *futures commission merchant* with the CFTC under the Commodity Exchange Act. So, certainly, establishing the fact that BitMEX had to register with the CFTC and had a regulatory registration obligation is *a prerequisite to our charges*.") (emphasis added).) But the Indictment does not specifically allege the basis for

regarding BitMEX as an FCM, nor does it allege each Defendant's knowledge that BitMEX was required to register with the CFTC as an FCM.

Because Defendants are charged with "willfully" causing BitMEX to violate the BSA, establishing that BitMEX was an FCM that was required to register with the CFTC and that Defendants knew of those facts and requirements are essential elements of the BSA charges. (Indictment ¶ 30.)  Indeed, Supreme Court precedent confirms that a willful violation of the BSA requires that each Defendant knew about the BSA requirements and intentionally ignored them. *United States v. Ratzlaf*, 510 U.S. 135, 140 (1994) (observing that the BSA's "omnibus 'willfulness' requirement . . . consistently has been read . . . to require both 'knowledge of the [BSA's] requirement[s]' *and* a 'specific intent to commit the crime,' *i.e.*, 'a purpose to disobey the law'").

   The Indictment's silence on each Defendant's knowledge of the alleged CEA registration requirement, much less the status of BitMEX as an FCM, obscures the nature of the BSA charges.  Rather than notify Defendants about the features of BitMEX that rendered the platform an FCM that was subject to the BSA, the Indictment presupposes that each Defendant was aware of BitMEX's FCM status and conclusorily alleges that "[f]rom in or about September 2015, when the CFTC issued public enforcement orders clarifying that cryptocurrencies are commodities for the purposes of the CEA . . . each of the [D]efendants knew that BitMEX could not serve U.S. customers without complying with U.S. AML and KYC requirements." (Indictment ¶ 25.)  But it simply does not follow from any alleged knowledge of those public orders—which made no mention of FCMs or BSA obligations—that BitMEX was an FCM and thus subject to the BSA's KYC and AML regime.  As such, Defendants are hampered in their ability to prepare a defense unless they understand what the government claims they knew about

the CFTC registration requirement at issue here, which is the "prerequisite" to the application of the BSA and the charges against Defendants.  *See United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000) ("[F]or an indictment to fulfill the functions of notifying the defendant of the charges against him and of assuring that he is tried on the matters considered by the grand jury, the indictment must state some fact specific enough to describe a particular criminal act, rather than a type of crime.").

### F.   The Government Must Provide Particulars About the Alleged Falsification of BitMEX Records and Purported Failures to Take Steps to Deactivate Accounts of U.S. Customers

The Indictment alleges that "each of" the Defendants failed to take steps to deactivate accounts of U.S. customers, and in the process, falsified BitMEX records or allowed them to be falsified.  (Indictment ¶¶ 26, 33(b).)  The government should provide particulars for the U.S. customers each Defendant knew about but failed to deactivate and the records that Defendants allegedly falsified or allowed to be falsified.

Despite stating that Defendants each failed to take steps to deactivate the accounts of U.S. users, the Indictment is silent about Defendant Hayes's knowledge of any specific U.S. customer accounts that required deactivation (*id.* ¶ 26), and it provides a total of three examples (one for Defendant Reed and two for Defendant Delo) of U.S. persons purportedly being allowed to trade on the platform (*id.* ¶¶ 26, 33(b)).  The Indictment also claims that Defendant Delo falsified internal BitMEX records to show that a customer "resided outside of the United States."  (*Id.* ¶ 33(b).)  The government should particularize all instances it intends to rely upon to show that each Defendant failed to deactivate known U.S. customers and thereby allegedly falsified BitMEX records.  *See Murgio*, 209 F. Supp. 3d at 723 (granting bill of particulars as to "dates, locations, and amounts of any bribes that [the defendant] paid to" co-defendant directly, where government suggested that no such payments were made, because the defendant was "entitled to

know" if "that characterization [was] inaccurate"); *United States v. Schlegel*, 2009 WL 10673617, at *3 (E.D.N.Y. Jan. 26, 2009) (directing the Government "to file a bill of particulars identifying the allegedly fraudulently reclassified expenses in 2003, 2004, and 2005 that the Government intends to prove at trial"); *United States v. Upton*, 856 F. Supp. 727, 753 (E.D.N.Y. 1994) (requiring bill of particulars for each allegedly falsified record upon which the government intended to rely).

As the court in *United States v. Upton* recognized, "it would be unfair . . . to allow the government to introduce allegedly falsified . . . records buried in thousands of documents already produced without prior notice to defendants of those documents upon which the government intends to rely."  856 F. Supp. at 753.  Indeed, "without prior knowledge of these documents, defendants are unduly hampered in the preparation of their defense and there is the risk of unfair surprise."  *Id.*  The *Upton* court recognized the risk of unfair surprise and prejudice to preparing a defense even though the indictment detailed thirty-three specific instances of falsified records. *Id.*  Accordingly, the government—consistent with *Upton*—should particularize the accounts Defendants failed to deactivate and the specific records the government contends that Defendants falsified.

## G.    The Government Must Identify the Alleged Co-Conspirators

Defendants are entitled to identification of the alleged co-conspirators known to the government in order to prepare a defense and avoid prejudicial surprise.  In *United States v. Nachamie*, the court identified six factors to consider in determining whether disclosure of unindicted co-conspirators is required.  91 F. Supp. 2d 565, 572 (S.D.N.Y. 2000).  The factors include: (1) the number of co-conspirators; (2) the duration and breadth of the alleged conspiracy; (3) whether the government otherwise has provided adequate notice of the particulars; (4) the volume of pretrial discovery; (5) the potential danger to co-conspirators and

the nature of the alleged criminal conduct; and (6) the potential harm to the government's investigation.  *Id*. at 573-74.  These factors support disclosure of the unindicted co-conspirators.

The first two factors weigh heavily in favor of disclosure of the unindicted co-conspirators.  There are an unspecified number of "others known and unknown," who are alleged to have conspired with Defendants.  (Indictment ¶¶ 32, 33, 33(a)-(b).)  The corporate entities that operated BitMEX, the trading platform at the center of the alleged conspiracy, have operations around the world, including—according to the Indictment—customer support, business development, and marketing activities located in "the United States and elsewhere."  (*Id.* ¶¶ 10, 19.)  Moreover, the alleged conspiracy spans five years, from September 2015 to September 2020.  (*Id.* ¶ 32.)  In analogous circumstances, courts have recognized the "increase[d] chance of surprise to the defendant at trial" where, as here, the government alleges an unspecified number of co-conspirators and a long-running conspiracy, which "spanned from the New York metropolitan area . . . to unknown international locations."  *Kahale*, 789 F. Supp. 2d at 372; *Nachamie*, 91 F. Supp. 2d at 572-73 (granting bill of particulars identifying known unindicted co-conspirators in case involving a "large number of co-conspirators (eight defendants and an unknown number of unindicted co-conspirators)" and lasting a "significant period of time (more than three years)").

The third and fourth factors also support disclosure.  The discovery to date is immense, totaling at least 333,559 separate files in fourteen global document productions and five 3500 material productions.  (Rodgers Decl. at ¶ 4.)  This factor, when coupled with an alleged long-running conspiracy with "an unknown number of co-conspirators and geographic locales," requires disclosure of alleged unidentified co-conspirators so that Defendants can "ascertain which primary actors they are accused of conspiring with."  *Kahale*, 789 F. Supp. 2d at 372-73;

*see also Kanekar*, 2020 WL 730353, at *6 (recognizing the increased likelihood of surprise at trial where there were "four defendants," "multiple unnamed co-conspirators," "over 500,000 discovery documents," and "a scheme that the government alleges occurred over the span of seven years").

*Finally*, unlike in criminal conspiracies involving crimes of violence, narcotics trafficking, or gun-running, none of the Defendants pose a potential danger to others. *See United States v. Stein*, 435 F. Supp. 2d 330, 359 (S.D.N.Y. 2006) ("[The government] may not obstruct defendants' access to a potential witness unless that is necessary to protect the witness's safety."). Nor is there any harm to the government's investigation given that the trial date in this case is set for March 28, 2021. (May 11, 2020 Order, ECF No. 71); *United States v. Ajemian*, 2012 WL 6762011, at *2 (E.D.N.Y. Dec. 27, 2012) (acknowledging "the potential harm to the Government's investigation is limited by the impending trial date"). Accordingly, because the *Nachamie* factors weigh in favor of a bill of particulars regarding the identities of the alleged co-conspirators, the Court should direct the government to provide this information.

## IV.   CONCLUSION

For the reasons set forth above, the Court should grant Defendants' Motion for a Bill of Particulars in its entirety.

Dated: September 10, 2021
    New York, New York

Respectfully submitted,

_____
Patrick J. Smith
Andrew J. Rodgers
SMITH VILLAZOR LLP
250 West 55th Street, 30th Floor
New York, New York 10019
Tel: (212) 377-0851
patrick.smith@smithvillazor.com
andrew.rodgers@smithvillazor.com

Harlan A. Levy
FOLEY HOAG LLP
1301 Avenue of the Americas
New York, New York 10019
Tel: (646) 927-5500
hlevy@foleyhoag.com

*Attorneys for Defendant Benjamin Delo*

_____
Douglas K. Yatter
Benjamin Naftalis
Hanyu (Iris) Xie
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, New York 10020
Tel: (212) 906-1200
douglas.yatter@lw.com
benjamin.naftalis@lw.com
iris.xie@lw.com

Jack M. McNeily
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Tel: (312) 876-7700
jack.mcneily@lw.com

*Attorneys for Defendant Samuel Reed*

_____
James J. Benjamin, Jr.
Katherine Goldstein
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: (212) 872-8091
jbenjamin@akingump.com
kgoldstein@akingump.com

Peter Altman
AKIN GUMP STRAUSS HAUER & FELD LLP
1999 Avenue of the Stars, Suite 600
Los Angeles, CA 90067-6022
Tel: (310) 299-1000
paltman@akingump.com

*Attorneys for Defendant Arthur Hayes*