UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.                                    20 Cr. 500 (JGK)

ARTHUR HAYES, BENJAMIN DELO,
SAMUEL REED and GREGORY DWYER,

          *Defendants*.

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND .......................................................................................................................3

ARGUMENT .............................................................................................................................5

I.      Defendants Lacked Fair Notice that BitMEX Was Subject to the BSA Because of
Its Alleged Status as an FCM................................................................................................6

      A.      BSA Criminal Prohibitions Tied to the CEA's Opaque and Confusing
Registration Framework Fail to Provide Fair Notice................................................7

      B.      Classification of BitMEX as an FCM Conflicts with the CFTC's Guidance ........13

      C.      The CFTC Provided No Clear Guidance on Technological Measures to
Prevent U.S. Persons from Circumventing Restrictions .......................................19

II.     Defendants Lacked Fair Notice that the Cryptocurrency Products Traded on
BitMEX Were Subject to Criminal Prohibitions .................................................................21

      A.      The Uncertain Status of Cryptocurrency ..............................................................21

      B.      The CFTC's September 2015 Administrative Orders Could Not Determine
the Status of Cryptocurrency for Purposes of a Criminal Prohibition ..................23

      C.      Courts Have Yet to Definitively Determine the Status of Cryptocurrencies ........24

CONCLUSION ........................................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Disc. Corp. v. CFTC*,
  222 F.3d 1008 (D.C. Cir. 2000) ........................................................................... 8

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*,
  547 F.3d 109 (2d Cir. 2008)................................................................................. 26

*Bryan v. United States*,
  524 U.S. 184 (1998)............................................................................................... 7

*Cary Oil Co., Inc. v. MG Refin. & Mktg.*,
  2003 WL 1878246 (S.D.N.Y. Apr. 11, 2003)........................................................ 7

*CFTC v. McDonnell*,
  287 F. Supp. 3d 213 (E.D.N.Y. 2018) ........................................................... 25, 26

*CFTC v. My Big Coin Pay, Inc.*,
  334 F. Supp. 3d 492 (D. Mass. 2018) ............................................................ 25, 26

*CFTC v. Reynolds*,
  2021 WL 796683 (S.D.N.Y. Mar. 2, 2021) ......................................................... 26

*Christopher v. SmithKline Beecham Corp.*,
  567 U.S. 142 (2012)......................................................................................... 16, 20

*FCC v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012).................................................................................... 6, 7, 18

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972).......................................................................................... 5, 6

*Grede v. FCStone, LLC*,
  867 F.3d 767 (7th Cir. 2017) ................................................................................. 8

*In re Bybee*,
  945 F.2d 309 (9th Cir. 1991) ................................................................................. 7

*In re MF Glob. Holdings Ltd. Inv. Litig.*,
  998 F. Supp. 2d 157 (S.D.N.Y. 2014), *aff'd*, 611 F. App'x 35 (2d Cir. 2015)........ 10

*Klein & Co. Futures, Inc. v. Bd. of Trade of N.Y.*,
  464 F.3d 255 (2d Cir. 2006).................................................................................. 8

*Kolender v. Lawson*,
461 U.S. 352 (1983) ................................................................. 7

*Leist v. Simplot*,
638 F.2d 283 (2d Cir. 1980) .................................................. 8

*PHH Corp. v. Consumer Financial Protection Bureau*,
839 F.3d 1 (D.C. Cir. 2016) .................................................. 20

*SEC v. Kik Interactive Inc.*,
492 F. Supp. 3d 169 (S.D.N.Y. 2020) .................................. 25

*Skilling v. United States*,
561 U.S. 358 (2010) .......................................................... 5, 6

*Stoller v. CFTC*,
834 F.2d 262 (2d Cir. 1987) ................................................ 16

*United States v. Apex Oil Co., Inc.*,
132 F.3d 1287 (9th Cir. 1997) ............................................ 27

*United States v. Davis*,
139 S. Ct. 2319 (2019) ....................................................... 23

*United States v. Faiella*,
39 F. Supp. 3d 544 (S.D.N.Y. 2014) ............................... 24, 25

*United States v. Lanier*,
520 U.S. 259 (1997) ..................................................... passim

*United States v. Mallas*,
762 F.2d 361 (4th Cir. 1985) .............................................. 10

*United States v. Murgio*,
209 F. Supp. 3d 698 (S.D.N.Y. 2016) .................................. 25

*United States v. Pennsylvania Indus. Chem. Corp.*,
411 U.S. 655 (1973) ............................................... 14, 15, 18

*United States v. Pirro*,
212 F.3d 86 (2d Cir. 2000) ........................................ 9, 10, 21

*United States v. Plaza Health Labs., Inc.*,
3 F.3d 643 (2d Cir. 1993) ................................................... 24

*United States v. Smith*,
985 F. Supp. 2d 547 (S.D.N.Y. 2014) ................................... 5

*United States v. Taylor,*
 2003 WL 22073040 (S.D.N.Y. Sept. 5, 2003)............................................. 21

*United States v. Ulbricht,*
 31 F. Supp. 3d 540 (S.D.N.Y. 2014)....................................................... 25

*United States v. Ward,*
 2001 WL 1160168 (E.D. Pa. Sept. 5, 2001) .............................................. 18

*Upton v. SEC,*
 75 F.3d 92 (2d Cir. 1996)....................................................... 13, 18, 24

## **Statutes**

7 U.S.C. § 1a(6) ....................................................................................... 8

7 U.S.C. §1a(9) .................................................................................... 4, 22

7 U.S.C. § 1a(15) ..................................................................................... 9

7 U.S.C. § 1a(28) ..................................................................................... 8

7 U.S.C. § 1a(37) ..................................................................................... 8

7 U.S.C. § 1a(50) ..................................................................................... 9

7 U.S.C. § 7................................................................................................ 8

18 U.S.C. § 1960..................................................................................... 25

31 U.S.C. § 5311 ...................................................................................... 3

31 U.S.C. § 5312(c)(1)(A) .................................................................... 6, 8

## **Rules and Regulations**

Fed. R. Crim. P. 12(b)(3) ......................................................................... 1

17 C.F.R. § 1.3 .......................................................................................... 8

17 C.F.R. § 38.607 .................................................................................. 12

17 C.F.R. § 39.13(g) ............................................................................... 12

17 C.F.R. § 42.2 ........................................................................................ 8

17 C.F.R. § 48.1 ........................................................................................ 9

17 C.F.R. § 48.2 ........................................................................................ 9

31 C.F.R. § 1026.200 ............................................................................................ 8

31 C.F.R. § 1026.210 ............................................................................................ 8

**Other Authorities**

CFTC Div. of Trading & Mkts., *Report on Lessons Learned from the Failure of Klein & Co. Futures, Inc.* (July 2001),
http://www.cftc.gov/files/tm/tmklein_report071101.pdf ....................................... 14

CFTC, *Clearing Organizations*,
https://www.cftc.gov/IndustryOversight/ClearingOrganizations/index.htm
(last visited Dec. 21, 2021) ............................................................................ 13, 14

CFTC, *Concurring Statement of Commissioner Dawn D. Stump Regarding Enforcement Action Against Coinbase, Inc.* (Mar. 19, 2021),
https://www.cftc.gov/PressRoom/SpeechesTestimony/stumpstatement031921
(last visited Dec. 21, 2021) ................................................................................. 17

CFTC, *Concurring Statement of Commissioner Dawn D. Stump Regarding Enforcement Action Against Payward Ventures, Inc. (d/b/a Kraken)* (Sept. 28, 2021),
https://www.cftc.gov/PressRoom/SpeechesTestimony/stumpstatement092821b
(last visited Dec. 21, 2021) ................................................................................. 16

CFTC, *Concurring Statement by Commissioner Dawn D. Stump Regarding Tether and Bitfinex Settlement* (Oct. 15, 2021),
https://www.cftc.gov/PressRoom/SpeechesTestimony/stumpstatement101521
(last visited Dec. 21, 2021) ................................................................................. 17

CFTC, *Intermediaries*,
https://www.cftc.gov/IndustryOversight/Intermediaries/index.htm
(last visited Dec. 21, 2021) ................................................................................. 13

CFTC, *Trading Organizations*,
https://www.cftc.gov/IndustryOversight/TradingOrganizations/index.htm
(last visited Dec. 21, 2021) ................................................................................. 13

Crypto-Currency Act,
H.R. 6154, 116th Cong. (2020) ........................................................................... 22

Digital Asset Market Structure and Investor Protection Act,
H.R. 4741, 117th Cong. (2021-2022) ................................................................. 22

*In the Matter of Coinflip, Inc.*,
CFTC No. 15-29, 2015 WL 5535736 (Sept. 17, 2015) .................................... 4, 12

*In the Matter of TeraExchange LLC*,
    CFTC No. 15-33, 2015 WL 5658082 (Sept. 24, 2015) ...................................................... 4, 13

*Oversight of the SEC: Hearing Before the S. Comm. on Banking, Housing, and Urban Affairs*,
    Testimony of SEC Chairman Gary Gensler (Sep. 14, 2021),
    https://www.sec.gov/news/testimony/gensler-2021-09-14 (last visited Dec. 21, 2021) .......... 23

Defendants Arthur Hayes, Benjamin Delo, and Samuel Reed (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Indictment (ECF No. 2) pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure.

## PRELIMINARY STATEMENT

This is a test case in which the government seeks to enforce criminally two highly technical statutory regimes in a novel set of circumstances where the line between criminal and innocent conduct was unknowable. Consistent with the mandate of the Due Process Clause that a person must have fair warning of proscribed conduct, the Court should dismiss the Indictment. No person of ordinary intelligence could have understood that the executives of an offshore, direct-access exchange for trading cryptocurrency derivatives, as the Indictment alleges BitMEX was, were subject to criminal sanctions under the Bank Secrecy Act ("BSA") for failing to adopt an anti-money laundering ("AML") program.

The government's case is charged under the BSA, but it depends entirely on interpretation of the Commodity Exchange Act ("CEA") and the alleged requirement that BitMEX register with the Commodity Futures Trading Commission ("CFTC") as a "futures commission merchant" ("FCM"). It is uncontroverted that the BSA applies to FCMs but *not* to other categories of businesses subject to CFTC registration, including exchanges and clearinghouses. To bring its BSA charge, the government has tried to shoehorn BitMEX into the registration category of an FCM, a type of entity recognized as an *intermediary between customers and an exchange*. Although the CFTC has never addressed through rulemaking the emergence of direct-access exchanges for cryptocurrency derivatives, it has recognized them as designated contract markets ("DCMs") and swap execution facilities ("SEFs"). Outside the world of cryptocurrency, CFTC rulemaking has also provided for direct access to offshore trading platforms in the registration category of foreign boards of trade ("FBOTs"). Neither

these categories of trading platforms nor clearinghouses under the CEA are subject to the provisions of the BSA.

Against this background, no ordinary person during the period of the Indictment could have been expected to understand, on pain of violating criminal law, that BitMEX was required to register as an FCM—triggering BSA responsibilities including maintaining an AML program—as opposed to other CFTC registration categories for an exchange or clearinghouse. Indeed, even a sitting Commissioner of the CFTC has stated—one year after the Indictment was returned in this case—that it is uncharted territory to apply FCM rules to an exchange. In light of the uncertain regulatory framework as applied to a twenty-first century trading platform for cryptocurrency derivative products, holding Defendants criminally liable would violate constitutional due process protections.

The fair notice issues inherent in charging that BitMEX was an FCM are exacerbated because the regulatory status of cryptocurrency is itself novel and unsettled. The several U.S. regulators that purport to have regulatory authority have been engaged in a turf war centered on whether digital assets are securities, commodities, or something else. Congress has not enacted legislation governing cryptocurrency. Regulators, including the CFTC, have not promulgated controlling regulations. Settled administrative enforcement actions, which the Indictment (wrongly) contends put Defendants on notice of alleged criminality, do not qualify under the Due Process Clause as settled law. The smattering of non-binding district court cases that have addressed the CFTC's claim that cryptocurrencies are commodities under the CEA were decided several years *after* the alleged start date of the crimes charged in the Indictment. In short, the government's case is constitutionally flawed and reflects impermissible regulation by criminal enforcement. The Indictment should be dismissed.

## BACKGROUND

Defendants are alleged to be the founders of BitMEX, which the Indictment describes as an "online trading platform" and "derivatives exchange" that "solicits and accepts orders for trades in . . . futures contracts and other derivative products tied to the value of cryptocurrencies including Bitcoin." (Indictment ¶¶ 1, 9-10, 18.) The Indictment alleges that Defendants founded BitMEX in or about January 2014 and registered the entities that own and operate BitMEX in the Seychelles. (*Id.* ¶¶ 9-10.) Defendant Hayes is alleged to have been the Chief Executive Officer; Defendant Delo is alleged to have been the Chief Operating Officer, and later, the Chief Strategy Officer; and Defendant Reed is alleged to have been the Chief Technology Officer. (*Id.* ¶ 12.)

The Indictment alleges that BitMEX "offered and allowed its customers to trade" several products including "Bitcoin futures," a "Bitcoin perpetual swap," and "additional futures contracts based on cryptocurrencies other than Bitcoin." (*Id.* ¶¶ 13-14.) In connection with the products BitMEX offered, the Indictment claims that BitMEX "accepted Bitcoin to margin customer trades" and "offered up to 100 times leverage on certain of its products." (*Id.* ¶ 15.) The Indictment also alleges that "BitMEX has solicited and accepted offers on its cryptocurrency futures and swaps from customers located in the United States." (*Id.* ¶ 17.)

The Indictment charges Defendants with (1) "willfully caus[ing]" BitMEX to violate the BSA, 31 U.S.C. § 5311, *et seq.*; and (2) "willfully and knowingly" conspiring to cause BitMEX to violate the BSA. (*Id.* ¶¶ 30, 32.) Both counts rely on the notion that BitMEX was required under the CEA to register with the CFTC as an FCM. (*Id.* ¶¶ 3, 5-8, 18); *see also* Aug. 11, 2021 Tr. at 36-37, ECF No. 117 ("[T]he subset of the BSA we are dealing with and the reason that BitMEX is a covered financial institution is because it is an entity required to register as a *futures commission merchant* with the CFTC under the Commodity Exchange Act. So, certainly,

establishing the fact that BitMEX had to register with the CFTC and had a regulatory registration obligation is *a prerequisite to our charges*.") (emphasis added). The Indictment alleges that BitMEX had to register with the CFTC as an FCM because (1) "Bitcoin and other virtual currencies are 'commodities' under the CEA" (Indictment ¶ 6), and (2) BitMEX was "a derivative exchange that offer[ed] and s[old] commodity futures and swaps to retail and non-retail customers in the U.S., and in connection with such offers and sales accepted property to margin, guarantee, and secure those trades and contracts." (*Id.* ¶ 18.)

The basis in the Indictment for asserting that virtual currencies are commodities under the CEA is two CFTC settled "enforcement orders" that were issued "in or about September 2015." (*Id.* ¶¶ 25, 28.) The referenced orders are *In the Matter of Coinflip, Inc.*, CFTC No. 15-29, 2015 WL 5535736, at *2 (Sept. 17, 2015), and *In the Matter of TeraExchange LLC*, CFTC No. 15-33, 2015 WL 5658082, at *3 n.3 (Sept. 24, 2015). Both orders rely on the catchall provision of the definition of "commodity" under the CEA, 7 U.S.C. §1a(9). Neither order underwent judicial scrutiny, as both resolved investigations through negotiated administrative settlements.

The *Coinflip* and *TeraExchange* settlements do not include a finding, or even a discussion, that the respondents were required to register with the CFTC as an FCM, or that an FCM has BSA duties. Nonetheless, the Indictment alleges that, based on these settled orders, Defendants allegedly knew about BitMEX's purported FCM registration obligation and that BitMEX as a result "could not serve U.S. customers without complying with U.S. AML and KYC requirements." (Indictment ¶ 25.) Yet in addition to alleging that BitMEX had to register as an FCM, the Indictment also describes BitMEX as "a derivatives exchange" (*id.* ¶ 18) and "an online trading platform" (*id.* ¶ 1), which "support[s] live trading" (*id.* ¶ 9) and "offer[s] and allow[s] its customers to trade" derivatives products (*id.* ¶¶ 13-14). The Indictment also alleges

4

that BitMEX, like a clearinghouse, "guarantee[d] the shortfall" if one party to a trade went into bankruptcy. (*Id.* ¶ 16.)

The Indictment alleges that Defendants took affirmative steps to avoid the application of U.S. law by causing BitMEX to "formally incorporate in the Seychelles." (*Id.* ¶ 21.) When BitMEX announced it was withdrawing from the U.S. market following the CFTC's 2015 *Coinflip* and *TeraExchange* orders, BitMEX updated its terms of service to include a "U.S. user ban" (*id.* ¶ 33(b)) and implemented an IP address check "designed to identify and block customers located in the United States from trading on BitMEX." (*Id.* ¶ 28.) The Indictment alleges that, notwithstanding these controls, Defendants "actively encouraged or allowed BitMEX to be accessed and used by U.S. customers, and failed to take steps to effectively restrict U.S. customers from accessing BitMEX." (*Id.* ¶ 25.) Conspicuously absent from the Indictment, however, is any reference to a standard that BitMEX was supposed to meet in restricting access by U.S. persons to avoid any CEA registration requirement.

## ARGUMENT

Under Rule 12(b)(3)(B)(v) of the Federal Rules of Criminal Procedure, a defendant may move to dismiss an indictment for "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v). A court may address "a constitutional attack on an indictment . . . within the context of a Rule 12(b)(3)(B) motion, 'because an indictment's defects can affect a defendant's substantive rights at trial.'" *United States v. Smith*, 985 F. Supp. 2d 547, 561-62 (S.D.N.Y. 2014), *aff'd sub nom. United States v. Halloran*, 664 F. App'x 23 (2d Cir. 2016).

"A criminal statute must clearly define the conduct it proscribes." *Skilling v. United States*, 561 U.S. 358, 415 (2010) (Scalia, J., concurring) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). Indeed, it is "[a] fundamental principle in our legal system . . . that laws

which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). "This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment." *Id.* A statute or regulation violates due process protections if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id*. (citation omitted). The "touchstone" of the notice prong "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997). The Indictment's theory of criminality arises out of a complex regulatory framework that failed to give fair notice that BitMEX should have registered as an FCM and that the cryptocurrency products at issue were commodity derivatives under the CEA.

## I.     DEFENDANTS LACKED FAIR NOTICE THAT BITMEX WAS SUBJECT TO THE BSA BECAUSE OF ITS ALLEGED STATUS AS AN FCM

The viability of this prosecution rests upon the premise that BitMEX was an FCM under the CEA with accompanying BSA obligations. *See* 31 U.S.C. § 5312(c)(1)(A) (defining an FCM as a financial institution under the BSA). But the classification of BitMEX as an FCM is far from clear under the CEA and conflicts with available CFTC guidance and historical practice for registration of trading platforms with direct-access features similar to BitMEX. Further heightening the fair-notice problem is the lack of any clear rules from the CFTC addressing the measures an offshore trading platform could follow to remain outside the CFTC's registration requirements and prevent U.S. persons from circumventing trading restrictions. Instead of first providing clear rules of law to appropriately warn Defendants (and others) whether the operation of an offshore, direct-access trading platform was subject to criminal liability as an FCM, the

government brought this test case based on its novel interpretation of two highly technical statutes: the CEA and BSA.

## A. BSA Criminal Prohibitions Tied to the CEA's Opaque and Confusing Registration Framework Fail to Provide Fair Notice

Criminal liability here depends on the interplay of two statutes that are not accessible to people of "common intelligence." *Fox Television Stations*, 567 U.S. at 253; *see also Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (criminal statutes must define the "offense with sufficient definiteness that ordinary people can understand what conduct is prohibited"). As courts have recognized, both the CEA and BSA are highly technical and complex. *See Bryan v. United States*, 524 U.S. 184, 194 (1998) (observing that the BSA is a "highly technical statute[] that present[s] the danger of ensnaring individuals engaged in apparently innocent conduct"); *Cary Oil Co., Inc. v. MG Refin. & Mktg.*, 2003 WL 1878246, at *4 (S.D.N.Y. Apr. 11, 2003) (recognizing the CEA and CFTC's regulation of derivative instruments as an "intricate regulatory scheme"); *In re Bybee*, 945 F.2d 309, 314-15 (9th Cir. 1991) (observing that "the field of commodities regulation is complex").

Under the government's theory, for Defendants to have understood that BitMEX was subject to the BSA, Defendants would first have to know that BitMEX had to register with the CFTC as an FCM, and not in a different registration category (like an exchange or clearinghouse) or no registration category at all. As alleged in the Indictment (¶¶ 6, 18), the CEA defines an FCM as an "individual, association, partnership, corporation, or trust" that is "engaged in soliciting or in accepting orders" for transactions in certain enumerated types of instruments, including futures, swaps, and retail commodity transactions, and in connection therewith, "accepts any money, securities, or property (or extends credit in lieu thereof)" to

"margin, guarantee, or secure" such transactions.  7 U.S.C. § 1a(28); 17 C.F.R. § 1.3; *see also* 31 U.S.C. § 5312(c)(1)(A).

FCMs have frequently been described as "financial intermediaries between investors and futures markets." *Grede v. FCStone, LLC*, 867 F.3d 767, 771 (7th Cir. 2017); *Klein & Co. Futures, Inc. v. Bd. of Trade of N.Y.*, 464 F.3d 255, 257 (2d Cir. 2006) ("As a FCM, Klein facilitated the trading and fulfilled certain obligations of its customers who traded through the NYBOT.").  "An FCM is the commodity market's equivalent of a securities brokerage house, soliciting and accepting orders for futures contracts and accepting funds or extending credit in connection therewith." *First. Am. Disc. Corp. v. CFTC*, 222 F.3d 1008, 1010 (D.C. Cir. 2000); *see also Leist v. Simplot*, 638 F.2d 283, 287 (2d Cir. 1980) (Friendly, J.) (describing the role of the FCM as an intermediary between investors and an exchange).  Based on this authority, an ordinary person would have fairly believed that FCMs serve a function that is distinct from exchanges and clearinghouses, which are subject to their own registration and regulatory requirements under the CEA.

Critically, while an FCM is subject to the BSA, *see* 17 C.F.R. § 42.2; 31 C.F.R. §§ 1026.200, 1026.210, an exchange—which registers with the CFTC as a DCM, SEF, or FBOT—is not.  A DCM is "a board of trade designated by the Commission as a contract market under the Act and in accordance with the provisions of part 38" of CFTC regulations.  17 C.F.R. § 1.3.  A "board of trade," in turn, is "any organized exchange or other trading facility," 7 U.S.C. § 1a(6); *see also* 7 U.S.C. § 7, and an "organized exchange" includes a trading facility that "permits trading" by retail persons.  7 U.S.C. § 1a(37); 17 C.F.R. § 1.3.  A SEF is defined as "a trading system or platform in which multiple participants have the ability to execute or trade swaps by accepting bids and offers made by multiple participants in the facility or system,

through any means of interstate commerce, including any trading facility, that (A) facilitates the execution of swaps between persons; and (B) is not a designated contract market." 7 U.S.C. § 1a(50). An FBOT provides members and other participants that are located in the United States with direct access to its electronic trading and order matching systems. 17 C.F.R. § 48.1. In other words, an FBOT is a direct-access platform, which the regulations define as "an explicit grant of authority by a [FBOT] to an identified member or other participant located in the United States to enter trades directly into the trading matching system of the [FBOT]." 17 C.F.R. § 48.2(c). FBOTs are the foreign equivalent of DCMs and are not subject to the BSA. 17 C.F.R. § 48.2(a).

Also excluded from the BSA's definition of "financial institution" are derivatives clearing organizations ("DCOs"). Under the CEA, a DCO is defined as "a clearinghouse, clearing association, clearing corporation, or similar entity, facility, system, or organization" that enables parties to (1) "substitute . . . the credit of the [DCO] for the credit of the parties"; (2) provides for "settlement or netting of obligations"; or (3) "otherwise provides clearing services or arrangements that mutualize or transfer [credit risk] among participants." 7 U.S.C. § 1a(15).

This complex web of registration categories, coupled with BitMEX's innovative features as alleged in the Indictment, outstrips any ordinary person's ability to decipher whether BitMEX—to the extent it was subject to CFTC jurisdiction at all—had to register as an FCM, as opposed to a DCM, SEF, FBOT, or DCO. As the Second Circuit has recognized, fair notice issues are particularly acute where, as here, proof of guilt is based on a willfulness standard. *United States v. Pirro*, 212 F.3d 86, 90-91 (2d Cir. 2000) (dismissing willfulness-based charge for failing to "charge a violation of a known legal duty"). Indeed, "[b]ecause only willful conduct is criminal" under the BSA, "and because willfulness requires a voluntary intentional

violation of a known duty, 'the duty involved must be knowable.'" *Id.* at 91. It cannot be that Defendants had fair notice that their conduct was criminal when the law regarding BitMEX's alleged requirement to register with the CFTC as an FCM was "vague" or "highly debatable." *Id.* (quoting *United States v. Mallas*, 762 F.2d 361, 363 (4th Cir. 1985)).

The Indictment itself affirmatively alleges that BitMEX was a direct-access exchange whose users placed trades directly on the platform without requiring an intermediary. For example, the Indictment describes BitMEX as "a derivatives exchange" (Indictment ¶ 18) and "an online trading platform" (*id.* ¶ 1), which "support[s] live trading" (*id.* ¶ 9) and "offer[s] and allow[s] its customers to trade" derivatives products (*id.* ¶¶ 13-14). This language, and these functions, are different from the role of an FCM as an intermediary, acting as an agent for its customers and sending their orders to a different entity—an exchange—for execution. *See In re MF Glob. Holdings Ltd. Inv. Litig.*, 998 F. Supp. 2d 157, 169 (S.D.N.Y. 2014) ("An FCM is an agent of its customers; it takes money that customers deposit with it and uses those funds to facilitate trades in futures contracts through commodities exchanges."), *aff'd*, 611 F. App'x 35 (2d Cir. 2015).

None of the direct-access trading platforms with features comparable to BitMEX's alleged attributes that have registered with the CFTC in recent years has registered as an FCM, and the CFTC never indicated that the applicants needed to register in that capacity. *See* Order of Designation, *In the Matter of the Application of KalshiEX LLC for Designation as a Contract Market* (Nov. 3, 2020) ("Kalshi DCM Order"), https://www.cftc.gov/sites/default/files /filings/documents/2020/orgkexkalshidesignation201103.pdf (designating the KalshiX direct-access platform for trading novel "event contract" derivative products as a DCM); Order of Designation, *In the Matter of the Application of LedgerX LLC for Designation as a Contract*

*Market* (June 24, 2019) ("LedgerX DCM Order"), https://www.cftc.gov/sites/default/files/filings/documents/2019/orgledgerxdcmorder190624.pdf (designating the LedgerX direct-access platform for trading cryptocurrency related derivatives, with Bitcoin as collateral, as a DCM); Order of Registration, *In the Matter of the Application of Eris Clearing, LLC for Registration as a Derivatives Clearing Organization* (July 1, 2019), *available at* https://www.cftc.gov/PressRoom/PressReleases/7954-19 (last visited Dec. 21, 2021) (granting Eris Clearing registration as a DCO for clearing of cryptocurrency related derivatives); CFTC Ltr. of Designation, *In the Matter of the Application of HedgeStreet, Inc. for Designation as a Contract Market* (Feb. 18, 2004), https://www.cftc.gov/sites/default/files/files/opa/press04/opahedgestreet_designation_order.pdf (designating the HedgeStreet direct-access platform for trading binary option derivatives as a DCM). In fact, some of the orders prohibited FCMs from intermediating transactions on these direct-access markets. *See, e.g.*, Kalshi DCM Order; LedgerX DCM Order.[1]

Ignoring the CFTC's interpretation and historical practice on registration, the Indictment's allegations that BitMEX was an FCM are little more than an incantation, containing

---

[1] The CFTC has also approved the registration of direct-access trading platforms in other orders without requiring registration as an FCM. *See, e.g.*, Order of Registration, *In the Matter of the Application of LedgerX LLC for Registration as a Swap Execution Facility* (July 6, 2017), https://www.cftc.gov/sites/default/files/idc/groups/public/@otherif/documents/ifdocs/orgledgerxord170706.pdf (granting LedgerX registration as a SEF); Order of Registration, *In re Matter of the Application of TeraExchange LLC for Registration as a Swap Execution Facility* (May 26, 2016), https://www.cftc.gov/sites/default/files/groups/public/@otherif/documents/ifdocs/orgsefteraexllcregord160526.pdf (granting TeraExchange registration as a SEF); Order of Designation as a Contract Market, *In the Matter of the Request of Eris Exchange, LLC for Designation as a Contract Market Under Section 5 of the Commodity Exchange Act and Part 38 of the Rules of the Commodity Futures Trading Commission* (Oct. 28, 2011), https://www.cftc.gov/sites/default/files/stellent/groups/public/@otherif/documents/ifdocs/erisexchangeorder102811.pdf (designating Eris Exchange as a DCM).

*no allegations* about BitMEX's features that rendered it an intermediary, which is the fundamental role traditionally played by an FCM in the CFTC's regulatory regime.[2]

The Indictment tries to overcome the fair-notice problems that accompany the alleged classification of BitMEX as an FCM by referencing two CFTC enforcement settlements from September 2015, which allegedly placed Defendants on notice "that BitMEX could not serve U.S. customers without complying with U.S. AML and KYC requirements." (Indictment ¶ 25.) But this allegation mischaracterizes the CFTC settlements, which could not have put Defendants on fair notice of the government's theory of criminality. *First*, neither settled order found the settling party was an FCM, nor even mentioned FCM status or potential BSA requirements based on the operation of a cryptocurrency derivatives platform. Rather, both orders involved failures to register under, or comply with, the rules for *swap execution facilities* (i.e., SEFs), a registration category for trading platforms to which the BSA does not apply. *See In the Matter of Coinflip, Inc.*, 2015 WL 5535736, at *2-4 (finding that a business which advertised itself as an online platform that "connects buyers and sellers of standardized Bitcoin options and futures

---

[2] The fair-notice problems in this case are even more pronounced because, under the CFTC's regulatory framework, there are some areas of functional overlap between FCMs, on one hand, and DCMs and DCOs, on the other. For example, the government alleges that BitMEX was an FCM because it "solicits and accepts orders for trades" and "accepted property to margin, guarantee, and secure those trades." (Indictment ¶¶ 1, 3, 6, 18.) But the government fails to appreciate that DCMs, especially in a direct-access model, receive trading requests directly, 17 C.F.R. § 38.607 (describing certain functions of DCMs that provide direct electronic access, distinct from the role of FCMs), and that DCOs receive funds as margin to guarantee and secure trades, 17 C.F.R. § 39.13(g) (requiring DCOs to maintain initial margin requirements). Indeed, the Indictment alleges that BitMEX, as a "derivatives exchange" (Indictment ¶ 18), "allow[ed] customers . . . to register and trade" (*id.* ¶ 23), and that customers "access and trade on BitMEX's platform" (*id.* ¶ 28). And the government's allegation that BitMEX "accepted Bitcoin to guarantee customer trades" is based on the "'Insurance Fund' that it uses to guarantee the shortfall in the event that one counterparty to a trade on BitMEX goes into bankruptcy" (*id.* ¶ 16), a mechanism that resembles a clearinghouse or DCO. These areas of overlap serve only to add confusion to an already murky and uncertain landscape.

contracts" and allowed users to trade options after depositing Bitcoin should have registered as a SEF); *In the Matter of TeraExchange LLC*, 2015 WL 5658082, at *2-3 (addressing regulatory compliance as a SEF by a platform that offered trading in Bitcoin swaps).

*Second*, statements in settled orders lack the force of law and cannot fairly have warned Defendants of the potential for criminal liability associated with not having a BSA-compliant AML and KYC program while offering trading in cryptocurrency derivative products on the BitMEX platform. *See Lanier*, 520 U.S. at 266 ("[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that *neither the statute nor any prior judicial decision* has fairly disclosed to be within its scope.") (emphasis added); *see also Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996) (observing that consent orders "carry 'little, if any, precedential weight'"). At bottom, these orders did nothing to clarify the opaque regulatory landscape that the government is now attempting to apply to BitMEX and the Defendants after the fact.

## B. Classification of BitMEX as an FCM Conflicts with the CFTC's Guidance

Consistent with case law and traditional understanding, the CFTC's website describes FCMs as intermediaries. *See* CFTC website, *Intermediaries*, https://www.cftc.gov/Industry Oversight/Intermediaries/index.htm (last visited Dec. 21, 2021). As explained on the CFTC website, "[a]n 'intermediary' is a person who acts on behalf of another person in connection with futures, swaps, or options trading" and includes FCMs (as well as other registration categories not pertinent here, such as commodity trading advisor or commodity pool operator). *Id*. As further explained on the CFTC website, the category of "Intermediaries" is distinct from the category of "Trading Organizations," which includes DCMs and SEFs, *see* CFTC website, *Trading Organizations*, https://www.cftc.gov/IndustryOversight/TradingOrganizations/ index.htm (last visited Dec. 21, 2021), as well as from "Clearing Organizations," or DCOs, *see*

CFTC website, *Clearing Organizations*, https://www.cftc.gov/IndustryOversight/Clearing

Organizations/index.htm (last visited Dec. 21, 2021).

In an amicus brief filed with the Supreme Court, the CFTC described the role of FCMs as

"an intermediary for its customers who trade[] on futures exchanges." *See* Br. for the United

States as Amicus Curiae Supp. Pet., *Klein & Co. Futures, Inc. v. Bd. of Trade of N.Y.*, 2007 WL

2070474, at *4 (July 19, 2007). More recently, the CFTC wrote in another amicus brief that

"[g]enerally speaking, an FCM is a broker that trades futures contracts for customers who open

an account with the FCM and deposit cash or securities to serve as margin for the customer's

trades." Br. of Amicus Curiae CFTC in Supp. of Appellant and of Reversal on Selected Issues,

*Grede v. FCStone, LLC*, 2013 WL 2954191, at *3 (June 6, 2013). In a report, the CFTC also

acknowledged that the roles played by FCMs are different from, and not coterminous with, other

market participants: "Each FCM plays an important risk intermediary role in the marketplace.

Clearinghouses look to the funds and credit of clearing FCMs for satisfaction of trading

obligations rather than to the actual floor broker, floor trader, or other customer. Each clearing

FCM, in turn, looks to the funds and credit of its customers." CFTC Div. of Trading & Mkts.,

*Report on Lessons Learned from the Failure of Klein & Co. Futures, Inc.*, at 2 (2001),

http://www.cftc.gov/files/tm/tmklein_report071101.pdf. And as noted above, the CFTC's

registration orders for direct-access trading platforms have recognized them as DCMs, SEFs,

and/or DCOs, not as FCMs. *See supra* at 10-11 & n.1.

Where an agency's own guidance about the meaning and application of a regulatory

framework is inconsistent with the government's theory of criminality, that guidance creates a

fair notice defect. *See United States v. Pennsylvania Indus. Chem. Corp.*, 411 U.S. 655, 674-75

(1973) ("[T]o the extent that the regulations deprived PICCO of fair warning as to what conduct

the Government intended to make criminal, we think there can be no doubt that traditional notions of fairness inherent in our system of criminal justice prevent the Government from proceeding with the prosecution."). The Indictment's classification of BitMEX as an FCM is at odds with the CFTC's consistent public positions on what an FCM is functionally, as well the registration category it has required of direct-access exchanges.

In recent briefing, the government has not addressed the novelty of applying the FCM registrant status to a trading platform like BitMEX, arguing instead that the regulatory landscape is clear and that "it is irrelevant whether [BitMEX] may have also performed functions that made it a futures exchange, swap execution facility, or other type of entity." (Dec. 13, 2021 Ltr. at 2, ECF. No. 221; *see also* Mem. of Law in Supp. of the Gov't's Mots. *In Limine* ("Gov't *In Limine* Mots.") at 37-38; Gov't Mem. of Law in Opp'n to the Defs.' Mots. *In Limine* at 15.) But this newly minted hypothesis ignores the CFTC's longstanding characterization of FCMs as intermediaries and its series of decisions approving the registration of trading platforms with direct-access features like those of BitMEX as DCMs, SEFs, and/or DCOs, and *not* as FCMs. *See supra* at 10-11 & n.1.

The extensive body of CFTC agency action stands in stark contrast to the government's position that it is "irrelevant whether BitMEX also met the definition of other types of entities." (Dec. 13 Gov't Ltr. at 2, ECF No. 221.) The CFTC's public statements and registration decisions show that a person of "common intelligence" would not have understood that a direct-access platform that permits trading of cryptocurrency derivative products, as BitMEX is alleged to be, was required to register as an FCM, rather than some other registration status under the CEA that would not invoke BSA criminal prohibitions. The government's novel prosecution theory that other registration categories are irrelevant is not only wrong, but also reflects a total

disregard for applicable precedent that informs whether criminal defendants have fair notice of allegedly unlawful conduct.  *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 157 (2012) (observing that an "agency should not change an interpretation in an adjudicative proceeding where doing so would impose 'new liability on individuals for past actions which were taken in good-faith reliance on agency pronouncements'"); *Stoller v. CFTC*, 834 F.2d 262, 265-66 (2d Cir. 1987) (observing that the government "may not charge a knowing violation . . . and thereby cause undue prejudice to a litigant who may have relied on the agency's prior policy or interpretation").

A recent settled enforcement action by the CFTC further undercuts the government's reliance on BitMEX's purported FCM status as the foundation for its criminal BSA charge.  In a settled order against Payward Ventures, Inc., which does business as an online cryptocurrency exchange under the name "Kraken," the CFTC found that Kraken engaged in off-exchange retail commodity transactions and operated as an unregistered FCM by "accepting orders for and entering into retail commodity transactions with customers, and accepting money or property (or extending credit in lieu thereof) to margin these transactions."  *See In re Matter of Payward Ventures, Inc.*, CFTC Docket No. 21-20 at 2-4 (Sept. 28, 2021), *available at* https://www.cftc.gov/PressRoom/PressReleases/8433-21 (last visited Dec. 21, 2021).

When the CFTC announced this settlement, CFTC Commissioner Dawn Stump issued a concurring statement explaining that a DCM "in non-CEA language" is "a futures exchange" that "is subject to Commission oversight."  CFTC website, *Concurring Statement of Commissioner Dawn D. Stump Regarding Enforcement Action Against Payward Ventures, Inc. (d/b/a Kraken)* (Sept. 28, 2021), https://www.cftc.gov/PressRoom/SpeechesTestimony/ stumpstatement092821b.  In her concurrence, Commissioner Stump observed that "the

application of the Commission's FCM rules to an exchange on which retail commodity transactions are traded *is uncharted territory at this time*." *Id.* (emphasis added). And while she "agree[d] that Kraken's activities [met] the definition of an FCM," Commissioner Stump emphasized that the determination that an exchange was an FCM was "a rather broad interpretation of the definition beyond the traditional application." *Id.* "Furthermore, how Kraken would be regulated as an FCM is not entirely clear, because many of the Commission's rules governing its regulation of traditional FCMs do not fit Kraken's role as an exchange. It also would be *unprecedented for an entity to register as both a DCM and an FCM*." *Id.* (emphasis added). Commissioner Stump noted that "if the Commission is going to hold an exchange liable for operating as an unregistered FCM with respect to retail commodity transactions, it is incumbent upon the Commission to explain in a transparent manner the relevant legal requirements for such an entity that seeks to register as an FCM and how the Commission will apply them in enabling the entity to conduct business with U.S. customers." *Id.* Commissioner Stump then reiterated these concerns in connection with a similar settlement a few weeks later. *See* CFTC website, *Concurring Statement by Commissioner Dawn D. Stump Regarding Tether and Bitfinex Settlement* ("Bitfinex Statement") (Oct. 15, 2021), https://www.cftc.gov/PressRoom/SpeechesTestimony/stumpstatement101521.[3]

---

[3] Similarly, in an earlier concurring statement to a CFTC settlement with cryptocurrency exchange Coinbase, Commissioner Stump noted that if Coinbase, which was a spot exchange, had "offered derivatives products, the CEA would require Coinbase to register with the CFTC," and "[d]epending on the types of derivatives products offered, the CEA requires that a trading platform become a designated contract market (DCM) or a registered swap execution facility (SEF)." *See* CFTC website, *Concurring Statement of Commissioner Dawn D. Stump Regarding Enforcement Action Against Coinbase, Inc.*, at n.3 (Mar. 19, 2021), https://www.cftc.gov/ PressRoom/SpeechesTestimony/stumpstatement031921.

The Commission-level debate, after Defendants were charged criminally, over the lack of clarity of the CFTC's own regulatory regime further illustrates the fair notice defect in this case. The government cannot base *criminal* charges on the application of the FCM registration category to a "derivatives exchange" like BitMEX for conduct allegedly spanning from 2015 to 2020 (Indictment ¶¶ 1-4, 18), when a sitting commissioner of the agency charged with administering the CEA publicly acknowledges that, even today, applying the FCM registration category to an exchange is "unchartered territory" and represents an *expansion* of the traditional application of the agency's rules. *See Pennsylvania Indus. Chem. Corp.*, 411 U.S. at 674; *Fox Television Stations*, 567 U.S. at 254 (finding agency's lack of notice of changed interpretation "fail[ed] to provide a person of ordinary intelligence fair notice of what is prohibited"); *Upton*, 75 F.3d at 98 (finding agency "may not sanction . . . pursuant to a substantial change in its enforcement policy that was not reasonably communicated to the public"); *United States v. Ward*, 2001 WL 1160168, at *16 (E.D. Pa. Sept. 5, 2001) ("A defendant should not be penalized for violating a regulation the interpretation of which cannot be agreed upon by those who are responsible for its administration and enforcement.").[4]

---

[4] Nor can the government defend the Indictment by citing other CFTC settlement orders and lawsuits, as it has attempted to do in recent motion briefing. (*See* Gov't *In Limine* Mots. at 8-9 (referring to a CFTC settlement with Bitfinex in 2016 and a lawsuit against 1Broker a/k/a 1Pool in 2018).) The FCM allegations in the Bitfinex negotiated settlement and the 1Broker/1Pool lawsuit are bound by their own facts and have no more force of law in this criminal case than the *Coinflip* and *TeraExchange* settlements. *See Lanier*, 520 U.S. at 266; *Upton*, 75 F.3d at 98. Moreover, in connection with a second settlement with Bitfinex in October 2021—for continuing similar conduct as in 2016—Commissioner Stump reiterated that "if the Commission is going to hold an exchange liable for operating as an unregistered FCM . . . it is incumbent upon the Commission to explain in a transparent manner the relevant legal requirements . . . ." Bitfinex Statement; *see also supra* at 17.

### C. The CFTC Provided No Clear Guidance on Technological Measures to Prevent U.S. Persons from Circumventing Restrictions

Compounding the lack of fair notice that BitMEX was subject to the CEA as an FCM is the lack of clarity that the CFTC provided to industry participants about measures that could be implemented to avoid the application of U.S. law and prevent U.S. persons from circumventing trading restrictions. The Indictment states that Defendants "took affirmative steps purportedly designed to exempt BitMEX from the application of U.S. laws" (Indictment ¶ 21), which included both a ban on U.S. persons and implementation of IP address checks "designed to identify and block customers located in the United States from trading on BitMEX." (*Id.* ¶¶ 28, 33(b).) Rather than credit these steps, the government maligns them as insufficient because BitMEX allegedly failed to do more, for example because it allegedly "applied the IP Address Check on just a single occasion for each customer" and allegedly "caused BitMEX to take no steps to restrict access of BitMEX via virtual private networks ('VPN') services," which could allow "U.S. customers to circumvent the IP [a]ddress [c]heck by making it appear as though they were accessing BitMEX from outside the United States." (*Id.* ¶ 28.)

The Indictment does not cite a single statute, regulation, rule, or other authoritative guidance that required BitMEX to check its users' IP addresses a certain way, or any guidance on whether or how a firm should address the use of VPNs to avoid U.S. jurisdiction. To defense counsel's knowledge, the only available information from the CFTC regarding the use of IP address checks prior to this case was in a March 2016 letter from the CFTC Division of Enforcement to a company named ICBIT Trading Inc., which published the letter on the Internet after receiving it. In that letter, the CFTC set forth certain measures ICBIT could implement to remain outside of CFTC jurisdiction, which included (1) blocking U.S. customers from accessing the website (based on their IP addresses) and (2) displaying a notice on the website notifying

users that the service cannot be used by U.S. citizens.  (*See* ECF No. 176-1 (ICBIT Ltr.).)  The letter was silent on the topic of VPNs or the specifics of IP detection.[5]

Aside from this single letter—which was made public by ICBIT—the CFTC has not provided any guidance regarding the standards that an offshore cryptocurrency derivatives trading platform had to meet in order to remain outside of U.S. regulatory jurisdiction, including anything having to do with VPNs or IP address detection.  The government's position in the Indictment that the measures BitMEX implemented with respect to IP address checks were insufficient reflects "a new agency interpretation that is [being] retroactively applied to proscribe past conduct."  *PHH Corp. v. Consumer Financial Protection Bureau*, 839 F.3d 1, 46 (D.C. Cir. 2016), *reinstated on reh'g en banc*, 881 F.3d 75 (D.C. Cir. 2018).  This prosecution-driven determination "contravenes the bedrock due process principle that the people should have fair notice of what conduct is prohibited."  *Id.*

Due process protections prevent the government from proceeding with a criminal prosecution based on alleged access by U.S. users, who used a VPN or other measures to disguise their location, when the only available insight from the CFTC never required such steps to avoid triggering the application of U.S. law.  *See id.* ("Due process . . . requires agencies to 'provide regulated parties fair warning of the conduct a regulation prohibits or requires'") (quoting *Christopher*, 567 U.S. at 156).  The government claims that it is not their job to tell market participants how to comply with the law.  (Gov't BoP Opp'n at 14-15.)  But this response

---

[5] While the Indictment does not mention the ICBIT letter, the government has referred to it in recent briefing.  (*See* Gov't *In Limine* Mots. at 7-8; Gov't Br. in Opp'n to Defs.' Mot. for a Bill of Particulars ("Gov't BoP Opp'n") at 17-18, ECF No. 177.)  The government appears to embrace this letter for its passing reference to ICBIT acting as an FCM (as if that could overcome the Indictment's fair notice defect), but wishes to ignore the letter's instruction to ICBIT that it would be outside of the CFTC's regulatory jurisdiction if it adopted such blocking measures.

is plainly inadequate under these circumstances, where market participants are offering new products on new platforms involving a new technology and find themselves in the crosshairs of a criminal prosecution because the government decided that their conduct crossed a line that did not exist at the time. *Cf. Pirro*, 212 F.3d at 91 (observing that "[i]f defendants . . . could not have ascertained the legal standards applicable to their conduct, criminal proceedings may not be used to define and punish an alleged failure to conform to those standards").[6]

## II. DEFENDANTS LACKED FAIR NOTICE THAT THE CRYPTOCURRENCY PRODUCTS TRADED ON BITMEX WERE SUBJECT TO CRIMINAL PROHIBITIONS

### A. The Uncertain Status of Cryptocurrency

The fair notice problems in this case are aggravated by the unsettled regulatory status of cryptocurrency. The Indictment's allegation that an entity like BitMEX had an FCM registration requirement under the CEA hinges on the classification of "Bitcoin and other virtual currencies" as "commodities" under the CEA. (Indictment ¶ 6 (alleging that the CEA requires "an entity to register as an FCM . . . if it solicits or accepts orders for commodity futures contracts, swaps, or retail commodity transactions"); *id.* ¶ 18 (alleging that BitMEX had an FCM registration requirement because it sold "commodity futures and swaps").) Yet the Indictment admits that the status of cryptocurrency under the CEA was unclear before September 2015. (*Id.* ¶¶ 25, 28 (alleging events in September 2015 that "clarif[ied] that cryptocurrencies are commodities for purposes of the CEA").)

---

[6] The government cannot save the Indictment by seeking refuge under the conspiracy count because, if the BSA count is dismissed for lack of notice, the conspiracy charge should be as well. *See, e.g.*, *United States v. Taylor*, 2003 WL 22073040, at *2 n.9 (S.D.N.Y. Sept. 5, 2003) (dismissing conspiracy claim where underlying offense was dismissed as legally deficient).

This candid admission is understandable:  Bitcoin and other cryptocurrencies were novel and innovative.  The pertinent statutory language was old and did not address or even contemplate the invention of digital assets.  Under the CEA, the term "commodity" means:

> wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil, and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice, and all other goods and articles, except onions (as provided by section 13–1 of this title) and motion picture box office receipts (or any index, measure, value, or data related to such receipts), and all services, rights, and interests (except motion picture box office receipts, or any index, measure, value or data related to such receipts) in which contracts for future delivery are presently or in the future dealt in.

7 U.S.C. §1a(9).  It is not controversial to observe that, immediately prior to September 2015, (a) Bitcoin and other cryptocurrencies were not one of the enumerated items; and (b) whether or not Bitcoin and other cryptocurrencies qualified as "other goods and articles . . .  and all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in" was neither a straightforward nor an easy question.

Equally important, it was a question that neither Congress nor the courts had addressed.  Congress had not amended the CEA to clarify the nature of cryptocurrencies or to grant the CFTC authority over virtual currencies.  Even today, there is no statute governing cryptocurrency in the United States and efforts to clarify cryptocurrency oversight are currently languishing in the House of Representatives.  *See, e.g.*, Crypto-Currency Act, H.R. 6154, 116th Cong. (2020) (proposing to establish agency oversight of cryptocurrencies among CFTC, FinCEN, SEC, and the Office of the Comptroller of the Currency); Digital Asset Market Structure and Investor Protection Act, H.R. 4741, 117th Cong. (2021-2022) (proposing a joint SEC and CFTC rulemaking categorizing each of the top 25 cryptocurrencies as either a "digital asset security" or a "digital asset" within the definition of commodity).

As of September 2015, when the Indictment claims that criminal liability attached to Defendants (Indictment ¶¶ 25, 28), federal courts had not taken up this question at all.  Nor had the CFTC or SEC at that time (or to this day) issued any duly promulgated regulations to clarify their competing views that cryptocurrencies may be commodities under the CEA or securities under the federal securities laws.[7]  Consistent with the allegations in the Indictment, this necessarily means that, as of September 2015, the question of whether the cryptocurrency products traded on BitMEX were subject to the CEA was unsettled, and there could be no criminal liability imposed based on the statutory definition of a commodity.  *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019) ("Vague laws contravene the 'first essential of due process of law' that statutes must give people 'of common intelligence' fair notice of what the law demands of them.").

## B.	The CFTC's September 2015 Administrative Orders Could Not Determine the Status of Cryptocurrency for Purposes of a Criminal Prohibition

In an attempt to address the conceded ambiguity about the nature of products traded on BitMEX's platform, the Indictment asserts that the CFTC settled the matter when it "issued . . . public enforcement orders" in September 2015, which "clarif[ied] that cryptocurrencies are commodities for the purposes of the CEA."  (Indictment ¶¶ 25, 28.)  The settled orders fail to provide fair notice for two reasons.

---

[7] The SEC's leadership recently stated that only a "small number" of crypto assets are not securities and that "very many" are.  *See Oversight of the SEC: Hearing Before the S. Comm. on Banking, Housing, and Urban Affairs*, 117th Cong. (Sept. 14, 2021) (Testimony of SEC Chairman Gary Gensler), *available at* https://www.sec.gov/news/testimony/gensler-2021-09-14 (last visited Dec. 21, 2021).  Given the overlapping assertion of authority in this area, Chairman Gensler recognized the benefit of Congress "weigh[ing] in" to clarify the responsibilities for market regulators.  *Id.*

*First*, as discussed above, *see supra* at 13, statements in two settled administrative enforcement orders necessarily lack the force of law—reflecting as they do the parties' desire to settle a civil matter rather than face the expense, uncertainty, and other costs of litigation—and could not have provided fair warning of any criminal prohibitions. *See Lanier*, 520 U.S. at 266; *Upton*, 75 F.3d at 98. For purposes of this criminal prosecution, the settled orders could not have fairly warned Defendants that criminal liability would apply on the basis that the "Bitcoin futures" and "Bitcoin perpetual swap," the only two products identified in the Indictment (Indictment ¶¶ 13-14), were commodity derivatives under the CEA.

*Second*, the Indictment's admission that the nature of cryptocurrencies was uncertain immediately prior to September 2015 is a concession that the CEA's definition of a commodity is vague as applied to derivatives tied to cryptocurrencies. The CFTC's position in the context of a civil enforcement action is not sufficient notice for the purpose of defining criminal conduct tied to a BSA violation. *See United States v. Plaza Health Labs., Inc.*, 3 F.3d 643, 648 (2d Cir. 1993) (observing that, "in civil-penalty . . . settings . . . greater flexibility of interpretation to further remedial legislative purposes is permitted"). Accordingly, the legal status of cryptocurrency as a commodity remained unclear, and the constitutional vagueness problems were not cured, even after the two CFTC settlements in September 2015.

### C. Courts Have Yet to Definitively Determine the Status of Cryptocurrencies

It was not until March 2018—some two and a half years after the beginning of the alleged conspiracy in the Indictment—that any federal court issued a ruling on whether cryptocurrency could be considered a commodity under the CEA. Prior to that, the few court decisions that addressed the nature of virtual currencies determined that Bitcoin was "funds" under certain federal statutes because "[they] can be either used directly to pay for certain things or can act as a medium of exchange and be converted into a currency which can pay for things."

*United States v. Ulbricht*, 31 F. Supp. 3d 540, 570 (S.D.N.Y. 2014); *United States v. Faiella*, 39

F. Supp. 3d 544, 545 (S.D.N.Y. 2014) (finding Bitcoin "clearly qualifies as 'money' or 'funds'").

Courts continued to recognize that cryptocurrency was "funds" even after September

2015 in parallel to arguments that the CFTC had classified Bitcoin as a commodity.  *See United*

*States v. Murgio*, 209 F. Supp. 3d 698, 707-09 (S.D.N.Y. 2016) (observing that there was a

"consensus" within this district that bitcoins are "funds" under 18 U.S.C. § 1960).  In addressing

whether the CFTC's *Coinflip* settlement altered the understanding that Bitcoin was "funds,"

Judge Nathan in *Murgio* observed that the CFTC's order was consistent with an understanding

that Bitcoins are "funds" because it defines Bitcoin as "a digital representative of value that

functions as a medium of exchange, a unit of account, and/or a store of value, but does not have

legal tender status." *Id*. at 709-10.

More recently, courts in this district have found that a cryptocurrency could be

considered an "investment contract" that is subject to the securities laws.  *See SEC v. Kik*

*Interactive Inc.*, 492 F. Supp. 3d 169, 183 (S.D.N.Y. 2020).  And more recently still, a jury

rejected this proposition even though the SEC had previously asserted that the cryptocurrency

token at issue was a security.  *Compare* Verdict Form at 2, *Audet v. Fraser*, Case No. 3:16-cv-

940 (MPS) (D. Conn. Nov. 1, 2021), ECF No. 330, *with* Compl. ¶¶ 79, 85, 91, *SEC v. Garza*,

No. 15-cv-01760 (D. Conn. Dec. 1, 2015), ECF No. 1.

Beginning in March 2018, courts started to address the CFTC's position that Bitcoin was

a "commodity" within the meaning of the CEA in civil enforcement actions brought by the

agency.  The first case was *CFTC v. McDonnell*, 287 F. Supp. 3d 213 (E.D.N.Y. 2018), where

the court issued a preliminary injunction to disrupt a *pro se* defendant's fraudulent scheme and

observed that "[v]irtual currencies can be regulated by [the] CFTC as a commodity." *Id.* at 223-

24, 228. A handful of other district court cases followed *McDonnell*, albeit not after full adversary testing. *See CFTC v. My Big Coin Pay, Inc.*, 334 F. Supp. 3d 492, 498 (D. Mass. 2018) (finding, at the pleading stage, that the CFTC adequately alleged that "My Big Coin" was a commodity under the CEA); *CFTC v. Reynolds*, 2021 WL 796683, at *5 (S.D.N.Y. Mar. 2, 2021) (default judgment finding "[v]irtual currencies such as Bitcoin are encompassed in the definition of 'commodity' under Section 1a(9) of the Act"). To date, no appellate court has weighed in on the question, and the handful of district court decisions do not have precedential authority. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*, 547 F.3d 109, 112 (2d Cir. 2008) ("District court decisions . . . are not precedential . . . [and] create no rule of law binding on other courts.").

These nonbinding district court decisions addressed the CFTC's civil enforcement powers. Central to the court's determination in *McDonnell* was the scope of the CFTC's civil enforcement powers and the liberal construction afforded the CEA's "remedial statutes." *McDonnell*, 287 F. Supp. 3d at 223-24. In the criminal context, the CFTC's broad interpretation of the CEA in regard to virtual currencies runs afoul of "the canon of strict construction of criminal statutes," and any deference afforded the CFTC in the civil enforcement context must yield to due process considerations when the CEA is the predicate for application of a criminal statute and does not "clearly cover[]" all virtual currencies. *Lanier*, 520 U.S. at 266.

The evolving treatment of Bitcoin by district courts before and during the Indictment period highlights the lack of fair notice that cryptocurrencies are commodities for the purpose of this criminal prosecution. Further, no reported case has considered whether the BSA's criminal prohibitions could be applied to an entity that offered derivative products based on cryptocurrencies on the theory that such instruments were commodity derivatives triggering

FCM registration obligations.  This case is the first, and its multiple fair notice defects require dismissal.

## CONCLUSION

For the reasons set forth above, the Court should grant Defendants' Motion to Dismiss the Indictment and dismiss with prejudice all charges against the Defendants.

Dated: December 21, 2021
New York, New York

Respectfully submitted,

/s/ *Patrick J. Smith*
Patrick J. Smith
Andrew J. Rodgers
SMITH VILLAZOR LLP
250 West 55th Street, 30th Floor
New York, New York 10019
Tel: (212) 377-0851
patrick.smith@smithvillazor.com
andrew.rodgers@smithvillazor.com

Harlan A. Levy
FOLEY HOAG LLP
1301 Avenue of the Americas
New York, New York 10019
Tel: (646) 927-5500
hlevy@foleyhoag.com

*Attorneys for Defendant Benjamin Delo*

/s/ *James J. Benjamin, Jr.*\*
James J. Benjamin, Jr.
Katherine Goldstein
Kaitlin D. Shapiro
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: (212) 872-8091
jbenjamin@akingump.com
kgoldstein@akingump.com
kshapiro@akingump.com

Peter Altman
AKIN GUMP STRAUSS HAUER & FELD LLP
1999 Avenue of the Stars, Suite 600
Los Angeles, CA 90067-6022
Tel: (310) 299-1000
paltman@akingump.com

*Attorneys for Defendant Arthur Hayes*

/s/ *Douglas K. Yatter*\*
Douglas K. Yatter
Benjamin Naftalis
Hanyu (Iris) Xie
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, New York 10020
Tel: (212) 906-1200
douglas.yatter@lw.com
benjamin.naftalis@lw.com
iris.xie@lw.com

Jack M. McNeily
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Tel: (312) 876-7700
jack.mcneily@lw.com

*Attorneys for Defendant Samuel Reed*

\* Electronic signature used with consent

28