UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

       - v. -

GREGORY DWYER,

          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:
:
:
:
:
:
:

20 Cr. 500 (JGK)

## GOVERNMENT'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Samuel Raymond
Thane Rehn
Assistant United States Attorneys

    - Of Counsel -

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................. 2

FACTUAL & PROCEDURAL BACKGROUND .................................................... 2

    A. Overview of the Charges and Dwyer's Role ............................................. 2

    B. Procedural History.................................................................................... 5

    C. Discovery ............................................................................................... 5

ARGUMENT ........................................................................................................ 7

    I. The Defendant's Fair Notice Arguments Fail on the Merits ........................ 7

    A. Applicable Law ...................................................................................... 7

    B. Discussion ............................................................................................. 9

        1. The Law Provides Fair Notice That Employees who Conspire in their Employers' Crimes, and Who Cause, Aid, and Abet Those Crimes are Criminally Liable. ................ 9

        2. The BSA Does Not Invite Arbitrary Enforcement. .................................... 16

    II. The Defendant Is Not Entitled to a Bill of Particulars ............................. 17

    A. Applicable Law .................................................................................... 17

    B. Discussion ........................................................................................... 22

CONCLUSION.................................................................................................... 26

## PRELIMINARY STATEMENT

Gregory Dwyer, an executive at the Bitcoin Mercantile Exchange with significant authority over and knowledge of the Company's actions, moves to dismiss the Indictment against him, asserting that he was not on fair notice that an employee in his circumstances could be held criminally liable for the Company's wholesale failure to comply with the Bank Secrecy Act. This motion is wholly unsupported under the law and the facts. There is nothing remotely novel about long-established principles of conspiracy and aiding-and-abetting liability, or using those principles to hold an individual like Dwyer accountable for his willful criminal violations. Indeed, Dwyer cites no case in which any court has dismissed an indictment based on a supposed fair notice problem with charging employees of a company for their role in helping the company to commit crimes. The Court should deny the motion to dismiss.

In the alternative, Dwyer moves for a bill of particulars. However, that request is also groundless. As with his co-defendants, who unsuccessfully moved for a bill of particulars, the Government has provided Dwyer with a host of evidentiary material, including the detailed Indictment, comprehensive discovery materials, detailed briefing regarding Dwyer's conduct, and ongoing discussions with defense counsel regarding the facts of this case. A bill of particulars is not necessary for Dwyer to prepare his defense, and his motion should be denied.

## FACTUAL & PROCEDURAL BACKGROUND

### A.  Overview of the Charges and Dwyer's Role

On October 1, 2020, the Government unsealed a two-count indictment (the "Indictment") charging Dwyer, along with his three co-defendants, Arthur Hayes, Benjamin Delo, and Samuel Reed, for his role in causing, aiding and abetting, and conspiring to cause violations of the BSA from in or about September 2015 through in or about September 2020. Specifically, Dwyer willfully caused, aided and abetted, and conspired to cause BitMEX—an online cryptocurrency

derivatives exchange that offered and solicited its services to thousands of U.S. customers—to violate U.S. law by willfully failing to establish, implement, and maintain a BSA-mandated anti-money laundering ("AML") program, including an adequate know-your-customer/customer identification program ("KYC") program.  Count One charges Dwyer with causing, aiding, and abetting BitMEX's BSA violations, in violation of Title 31, United States Code, Sections 5318(h) and (l), 5322(a) and (c), Title 31, Code of Federal Regulations, Sections 1026.210 and 1026.220, and Title 18, United States Code, Section 2; Count Two charges him with conspiring to cause BitMEX to violate the BSA, in violation of Title 18, United States Code, Section 371.

As set forth in the Indictment, Dwyer's three co-defendants are the co-founders and majority owners of BitMEX.  (Indictment ¶¶ 1, 9.)  Dwyer was hired by BitMEX as the first non-founder employee in or about late 2015.  (Indictment ¶ 12.)  Dwyer was an "executive" at BitMEX, and held various titles, including the Head of Business Development.  (Indictment ¶¶ 4, 12.)  As summarized in the Indictment, from 2017 through 2019 Dwyer was responsible for "conduct[ing] BitMEX operations from an office in Manhattan, New York, including but not limited to customer support, business development, and marketing, involving customers located in the United States and elsewhere."  (Indictment ¶ 19.)

While working at BitMEX, Dwyer, along with his co-defendants, is alleged to have "caused BitMEX to reject adoption or implementation of formal policies, procedures, and internal controls for AML; independent compliance testing for AML; and training for appropriate personnel in AML" (Indictment ¶ 22); "caused BitMEX to allow customers, including individual retail customers, to register and trade without providing sufficient identifying information or documents to allow BitMEX to form a reasonable belief that it knows the true identity of its customers" (Indictment ¶ 23), "actively encouraged or allowed BitMEX to be accessed and used

by U.S. customers, and failed to take steps to effectively restrict U.S. customers from accessing BitMEX" (Indictment ¶ 25), "knowingly allowed one of these customers to access BitMEX using a non-U.S. passport in the name of a third party that did not belong to this customer" (Indictment ¶ 26), "caused BitMEX to take no steps to restrict access of BitMEX via virtual private network ("VPN") services, which the defendants knew allowed U.S. customers to circumvent the IP Address Check by making it appear as though they were accessing BitMEX from outside the United States" (Indictment ¶ 28), and "engaged in marketing activities with the effect and intent of attracting U.S. customers" (Indictment ¶ 29).

Beyond the allegations in the Indictment, the Government has produced discovery materials which indicate other actions Dwyer took at BitMEX. As Head of Business Development, Dwyer had management authority over BitMEX's business operations and planning, with a particular focus on interfacing with customers, including customers in the United States. Dwyer was the most senior employee in BitMEX's New York office and generally controlled the company's operations during United States business hours, the time when United States users were most likely to be accessing and trading on the platform. Additionally, Dwyer was a member of BitMEX's executive committee, and through that position on the executive committee, participated in policy-making for the Company. According to Arthur Hayes' testimony to the CFTC in July 2019, most of BitMEX's "policies [were] approved at the executive committee level," i.e., by Dwyer and the other executive committee members.

The evidence will establish that Dwyer had authority at BitMEX both in his individual capacity as an executive and in his capacity as a member of the executive committee. This included influence over decisions about which users were allowed on the platform and what degree of identity verification BitMEX applied to its users. For example, the Government has provided

discovery materials reflecting various specific occasions on which Dwyer: collected and circulated data listing the United States "as the most popular Country by visits and average number of active users per day"; advised an individual trader in New York to create an offshore entity to trade on BitMEX; failed to stop access by U.S. customers from using VPNs despite being directly informed of such access; told BitMEX employees not to ask for verification information from a suspected U.S. trader; and told Ben Delo not to provide information to BitMEX employees about U.S.-based "affiliate users" which could have been used to remove U.S. customers. Indeed, because he was partially responsible for monitoring and reporting on BitMEX's trading data, he learned that the Company's claims that it did not need to have AML/KYC programs because it did not allow users from the United States were false, but did not thereafter take steps to remove these U.S. users or cause the Company to implement an AML/KYC program.

### B.  Procedural History

After Hayes, Delo, and Reed were arrested in 2020 and the first few months of 2021, this Court set a briefing schedule for those defendants. On September 10, 2021, Hayes, Delo, and Reed moved for a bill of particulars. Dkt. No. 126. Dwyer was arrested in October 2021. After briefing, the Court denied that motion in a hearing on November 23, 2021. On December 21, 2021, Hayes, Delo, and Reed moved to dismiss the Indictment on fair notice grounds. Dkt. Nos. 234, 235. While the motion was pending, Hayes and Delo pleaded guilty to Count One of the Indictment on or about February 24, 2022. On February 28, 2022, the Court denied the motion to dismiss as to Reed. Dkt. No. 291. On or about March 9, 2022, Reed pleaded guilty to Count One of the Indictment. This Court has now sentenced all three co-defendants.

### C.  Discovery

As of this filing, the Government has produced hundreds of thousands of documents as Rule 16 material. Those document productions include, *inter alia*, documents the Government

received from the CFTC, as described in prior briefing; returns from dozens of grand jury subpoenas; public records including from BitMEX's website; responsive returns from search warrants executed on email and other electronic accounts, physical devices, and forensic images; and internal FBI reports. The Government has also produced statements for potential witnesses within its possession, including for individuals the Government does not actually intend to call at the trial scheduled in this matter for October 2022 (which the Government is under no legal obligation to produce and, even for anticipated witnesses, is producing months in advance of any pretrial disclosure deadline). The Government is continuing to produce documents and witness statements in its possession as it obtains them.

Dwyer also benefits from the extensive briefing the Government has already done in in connection with the trial preparation and sentencing of his co-defendants, which provided a detailed overview of the Government's case. For instance, the Government has previously briefed—and has also discussed with Dwyer's counsel—Dwyer's role in monitoring and reporting on BitMEX's user data. The Government and Dwyer's counsel have discussed a January 2017 communication, in which he circulated what was called an "analytics report" for the prior year to Hayes, Delo, and Reed. That report listed, among other information, a "Geographic Traffic Summary" which listed "Top 30 Countries by Visits and active users per quarter." The data showed dozens of U.S. users per day, and as Dwyer himself summarized, the "United States remains as the most popular Country by visits and average number of active users per day." Similarly, the parties have discussed a July 2017 communication wherein Dwyer sent another "analytics report," this time adding data through May of 2017. This data showed over 200 U.S. users on BitMEX per day, and once again, Dwyer wrote that the "United States remains as the most popular Country by visits and average number of active users per day."

The Government has also produced in discovery and discussed with defense counsel evidence of Dwyer's role as a senior corporate executive officer at BitMEX and a member of BitMEX's executive committee.  As described above, Dwyer had management authority over BitMEX's business operations and planning, including in the United States and through his policy-making role while serving on the executive committee.  This authority is confirmed by Hayes' CFTC testimony and the statements of other former BitMEX employees, which the Government has produced to the defense in the form of early productions of 3500 material.

The Government has also responded by telephone, email, and letter to requests for information to assist the defendants in reviewing discovery.  For instance, the defense sent a number of inquiries to the Government, and the Government responded with a lengthy letter providing particular references to documents in the discovery or references in the Indictment for each question.  *See* Dabbs Declaration, Ex. A (the "November 12, 2021 Letter").

## ARGUMENT

## I.  The Defendant's Fair Notice Arguments Fail on the Merits

### A.  Applicable Law

"A defendant faces a high standard in seeking to dismiss an indictment, because an indictment need provide the defendant only a plain, concise, and definite written statement of the essential facts constituting the offense charged."  *United States v. Smith*, 985 F. Supp. 2d 547, 561 (S.D.N.Y. 2014), *aff'd sub nom. United States v. Halloran*, 664 F. App'x 23 (2d Cir. 2016). "An indictment is sufficient as long as it (1) 'contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend,' and (2) 'enables [the defendant] to plead an acquittal or conviction in bar of future prosecutions for the same offense.'"  *United States v. Wedd*, 993 F.3d 104, 120 (2d Cir. 2021) (quoting *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (internal quotation marks omitted)). "'[A]n indictment need do little more than

to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'" *Id.*

Additionally, the Second Circuit has long held that "summary judgment does not exist in federal criminal procedure." *Id.* at 121 (citing *United States v. Sampson*, 898 F.3d 270, 282 (2d Cir. 2018)). Thus, the "district court must give the Government an opportunity to 'make a detailed presentation of the entirety of the evidence before ... dismiss[ing] an indictment on sufficiency grounds,' and the district court lacks the authority 'to require the government, before trial, to make such a presentation' as this 'could effectively force a summary judgment-like motion on the government.'" *Id.*

A criminal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Halloran*, 821 F.3d 321, 337 (2d Cir. 2016) (internal quotation marks omitted). While defendants must be given fair notice that their conduct is unlawful, due process does not require that there be "a factual situation that is 'fundamentally similar'" to the crime charged. *United States v. Lanier*, 520 U.S. 259, 269 (1997); *Ponnapula v. Spitzer*, 297 F.3d 172, 183 (2d Cir. 2002) ("Due process is not, however, violated simply because the issue is a matter of first impression"); *see also Kergil v. United States*, No. 12 CR. 152 (CM), 2019 WL 3940621, at *9 (S.D.N.Y. Aug. 1, 2019). Besides the statutory language itself, "clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute." *Lanier*, 520 U.S. at 269.

"Although a law has to provide minimal guidelines in the form of explicit standards regarding what conduct is unlawful, it need not achieve meticulous specificity, which would come at the cost of flexibility and reasonable breadth." *United States v. Rosen*, 716 F.3d 691, 699 (2d

Cir. 2013) (internal quotation marks omitted).  Accordingly, "one whose conduct is clearly proscribed by the statute cannot successfully challenge it for vagueness." *United States v. Nadi*, 996 F.2d 548, 550 (2d Cir. 1993); *see also Maynard v. Cartwright*, 486 U.S. 356, 361 (1988) ("Objections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk."); *United States v. Roberts*, 363 F.3d 118, 123 (2d Cir. 2004) (skepticism about a lack of fair notice is "further buttressed by the government's proffer that the defendants actually believed what they were doing was illegal").

"[E]conomic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process." *Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982); *United States v. Saunders*, 828 F.3d 198, 207 (4th Cir. 2016) (citing *Village of Hoffman* in the criminal context); *United States v. Riccio*, 43 F. Supp. 3d 301, 307 (S.D.N.Y. 2014) (same).  Relatedly, the Supreme Court "has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Village of Hoffman Estates*, 455 U.S. at 498; *see also Riccio*, 43 F. Supp. 3d at 307.

**B.  Discussion**

**1.  The Law Provides Fair Notice That Employees who Conspire in their Employers' Crimes, and Who Cause, Aid, and Abet Those Crimes are Criminally Liable.**

Dwyer's fair notice argument is without foundation given the clear and unambiguous provisions of the relevant statutes governing aiding and abetting and conspiracy liability.  Dwyer

is not charged with a substantive violation of the BSA, or in reliance on the BSA's direct application to him.  He is charged with causing and aiding and abetting BitMEX's BSA violations, pursuant to 18 U.S.C. § 2, and conspiring to violate the BSA, pursuant to 18 U.S.C. § 371. This Court has already held that the text of the BSA and the Commodity Exchange Act ("CEA") provided fair notice that a futures commission merchant ("FCM") is a financial institution that must have AML and KYC programs, and that there was fair notice that cryptocurrency was a commodity for purposes of the CEA, meaning that a cryptocurrency FCM was subject to the AML/KYC requirement.  Dkt. No. 291.  The Court further held that the Indictment alleges that BitMEX met the statutory definition of an FCM, and that the Company nonetheless willfully failed to comply with the BSA by failing to implement an AML or KYC program.  *Id.*  Dwyer concedes there is no basis to relitigate those holdings.  Dwyer Motion at 7.  But that means that in order to prevail on his motion to dismiss, Dwyer would have to establish that 18 U.S.C. § 2 and 18 U.S.C. § 371 do not provide adequate notice.  Dwyer unsurprisingly provides no argument or case law for such an outlandish proposition.

Dwyer tries to evade that fatal flaw in his motion by instead arguing that the relevant BSA provisions, standing alone, would not provide notice that he could be held criminally liable for BitMEX's BSA because he was a mere "employee" who did not have a sufficiently high management position or sufficiently large ownership stake in BitMEX.  Dwyer Motion at 10–14.  But that argument ignores the application of 18 U.S.C. §§ 2 and 371, which demonstrably make mere employees liable for corporate offenses when they cause or aid and abet those offenses, or conspire to commit them.

Dwyer argues that a person of "common intelligence" would not understand the text of the BSA to apply to an employee because the statute governs "financial institutions" rather than

individuals.  Dwyer Motion at 10.  But there is no dispute that the legal obligation to have AML and KYC programs was on BitMEX as a financial institution; the Indictment expressly states as much.  (Indictment ¶ 30) (defendants "willfully cause[d] a *financial institution* to violate the Bank Secrecy Act") (emphasis added).   As described above, Dwyer is not charged with violating the BSA in his individual capacity; he is charged in Count One with willfully causing, aiding, and abetting BitMEX's violation of the BSA, and in Count Two with conspiracy to violate the BSA. It is black-letter law that a person can be convicted of aiding and abetting or conspiracy even if another person or entity committed the substantive crime.  That is the very nature of these theories of criminal liability.  *See, e.g., United States v. Labat,* 905 F.2d 18, 23 (2d Cir.1990) ( "To convict a defendant on a theory of aiding and abetting, the government must prove that *the underlying crime was committed by a person other than the defendant* and that the defendant acted, or failed to act in a way that the law required him to act, with the specific purpose of bringing about the underlying crime.") (emphasis added); *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008) (defendant may be convicted of conspiracy even without knowing all details of criminal agreement or even the identities of all co-conspirators, "so long as he knew its general nature and extent").

Indeed, it is commonplace for corporate officers, employees, and agents to be held criminally liable when they cause, aid or abet violations of the law committed by their employer companies, or conspire to do so.  This includes officers and employees with similar positions and responsibilities to Dwyer's position and responsibilities at BitMEX.  *See, e.g., United States v. Ferguson*, 676 F.3d 260, 272-73, 291-92 (2d Cir. 2011) (multiple employees of AIG and Gen Re, including AIG's vice president of reinsurance, charged for conspiracy to commit securities violations and securities violations based on causing AIG to make false statements in its required SEC filings); *United States v. Dale*, 991 F.2d 819, 831 (D.C. Cir. 1993) (multiple employees of

company who managed company's regional offices charged for aiding and abetting company's underreporting of taxable income on corporate tax returns); *United States v. Mekawy*, 20 Cr. 406 (S.D.N.Y. 2020) (employee of broker dealer charged with conspiracy for causing company to make false SEC filings); *United States v. Raffle*, S1 12 Cr. 314 (W.D. Tex. 2013) (company's vice president of corporate development charged with conspiracy and aiding and abetting for causing company to make false SEC filings). That is true even when the relevant legal duty is, as here, on the company rather than an individual. *E.g.*, *Mekawy*, 20 Cr. 406. A defendant need not even be an employee of the company that violated the law, as long as there is evidence that the defendant willfully assisted the company's violation. *United States v. Gurary*, 860 F.2d 521, 524 (2d Cir. 1988) (affirming "defendants' conviction for aiding and assisting the filing of corporate principals' fraudulent tax returns," and for conspiracy to file false tax returns, when defendants were outside contractors who provided false invoices to companies to assist the companies in filing false tax returns).

Because corporations can only act through employees or agents, it is a bedrock principle that such individuals can be charged criminally for their role in these corporate criminal violations. *E.g. United States v. Wise*, 370 U.S. 405, 409 (1962) ("No intent to exculpate a corporate officer who violates the law is to be imputed to Congress without clear compulsion; else the fines established by the Sherman Act to deter crime become mere license fees for illegitimate corporate business operations."); *United States v. Amrep Corp.*, 560 F.2d 539, 545 (2d Cir. 1977) ("Where, however, the prosecution introduces evidence of active and knowing participation by corporate officers, they are equally liable with the corporation."). Dwyer's motion, which argues that an employee who willfully helps his employer violate the law is not on fair notice that his conduct is

criminal, is wholly inconsistent with these longstanding principles of criminal law. Unsurprisingly, he does not cite a single case for that proposition.

Dwyer next contends that the "statutory and regulatory text" support his argument. Dwyer Motion at 11. He argues that the BSA's requirement to file suspicious activity reports can be applied by regulation to "any financial institution, and any director, officer, employee, or agent of any financial institution," 31 U.S.C. § 5318(g), whereas the requirement to have AML and KYC programs only applies to the "financial institution," 31 U.S.C. § 5318(h). Dwyer Motion at 11. But Dwyer's argument collapses on itself almost immediately. He concedes, as he must, that corporate "officers or directors" who control a company can be charged for the company's violation of the BSA. Dwyer Motion at 11-12. But that concession completely undermines his textual argument, because such persons are also listed in 5318(g) but not 5318(h). Additionally, for many financial institutions there is no single person who exercises "control," but rather multiple individuals, including employees, who can cause the corporation to act or fail to act. Dwyer's proposed rule that only a person who "controls" a company can be charged for the company's failure to have an AML/KYC program, which has no foundation in the statute or in case law, falls apart when applied to real-world cases. Additionally, Dwyer's argument contravenes the statutory scheme which applies criminal liability to any "person" who willfully violates any of its provisions. 31 U.S.C. § 5322(a).

In fact, the only case cited by Dwyer on this point directly contradicts his textual argument. He cites the Eleventh Circuit's decision in *United States v. Caro*, 454 F. App'x 817, 823-24, (11th Cir. 2012), for the proposition that a "financial institution's officers and directors must ensure that the BSA's [anti-money laundering] requirements are fulfilled." But the indictment in *Caro* specifically charged two "employees" of a company with conspiring with each other and with the

company to file false currency transaction reports, in violation of 18 U.S.C. § 371, and with causing the company to file false reports, in violation of 18 U.S.C. § 2. *See United States v. Caro*, S.D. Fla., 08 Cr. 20044, Dkt. No. 4 (Indictment ¶ 7) (S.D. Fla. Jan. 23, 2008). *Caro* thus illustrates the opposite of Dwyer's argument, demonstrating that employees can be criminally charged for their role in corporate violations of the BSA. The Indictment in this case charges Dwyer on the same theories of criminal liability—conspiracy and causing, aiding, and abetting—that the employees were charged with in *Caro*.

Dwyer's next argument is that the BSA's requirements for AML programs are "numerous and complex," and that this prevents the prosecution of employees who willfully help companies violate the law. Dwyer Motion at 12. But he has already conceded, as this Court previously held, that regardless of its complexities the BSA provided fair notice to BitMEX. Further, BitMEX did not merely fail to maintain a "satisfactory AML program," Dwyer Motion at 12. As alleged in the Indictment, BitMEX had *no* such program whatsoever. *E.g.* (Indictment ¶ 23) ("Prior to in or about August 2020, customers could register to trade on BitMEX anonymously"). Many regulatory areas governing corporate conduct, including in such areas as tax and securities law for which individual employees are routinely prosecuted, are "numerous and complex." The complexity of a legal scheme does not bar criminal prosecutions for employees who willfully cause companies to violate the law, and Dwyer again cites no case for his novel proposition. Dwyer is, of course, free to argue at trial that he did not understand the legal requirements of the BSA due to its complexity and so did not act willfully. But that is not a question of fair notice, but of the merits of his guilt or innocence of the charges against him.

Dwyer further argues that his alleged roles in the company did not give him authority to "set compliance and legal policies" for the company. Dwyer Motion at 12. As noted, that

argument is wrong as a factual matter. Dwyer was on BitMEX's executive committee which played a significant role in setting company policies, as Hayes specifically acknowledged in his CFTC testimony. And there is no need for the Government to prove that Dwyer set policies or was the mastermind who engineered the company's BSA violations. Even minor participants in a criminal scheme are not immune from prosecution if they joined the conspiracy or aided and abetted the crimes. *United States v. Jordan*, 927 F.2d 53, 55 (2d Cir. 1991) ("The 'causer' is punishable as a principal for willful action that brings about an offense. Those who aid and abet the 'causer' cannot expect insulation from criminal responsibility."). But in any event, this is another factual argument to be resolved at trial – whether Dwyer in fact caused or aided abetted BitMEX's violations of the BSA – not a grounds for dismissal.

Nor can Dwyer salvage his argument by contending that the statute is "ambiguous," such that the Court should apply the rule of lenity. Dwyer Motion at 13. As described further above, this Court has already recognized that the plain terms of the BSA's AML requirement apply to a company like BitMEX, Dkt. No. 291, and there is no ambiguity in either 18 U.S.C. § 2 or 18 U.S.C. § 371. Dwyer attempts to manufacture ambiguity by focusing exclusively on the BSA's application to financial institutions, but that ignores the long-established role that the aider and abettor and conspiracy statutes play in cases such as this. Similarly, it is irrelevant whether any prior case has subjected a defendant to criminal liability on exactly the same facts. The defendant cites *United States v. Lanier*, 520 U.S. 259, 266 (1997) to argue that "novel" prosecutions violate the Due Process Clause, but the very next sentence of *Lanier* explains that there is no requirement of a prior judicial decision when the applicable criminal statutes clearly apply to a defendant. *Lanier*, 520 U.S. at 267 ("[T]he touchstone is whether the statute, either standing alone or as

construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.").

### 2. The BSA Does Not Invite Arbitrary Enforcement.

Dwyer's second argument is that the Government's theory as to him would allow for "arbitrary enforcement" and "unfettered discretion" in prosecuting violations of the BSA. Dwyer Motion at 15–16. He claims that his duties at BitMEX, such as customer support and marketing, are the types of duties that are performed by "broad swaths of employees in the private sector." Those are arguments about whether the facts the Government will establish against Dwyer make him guilty of the crime, an issue properly addressed by the jury at his trial, not about whether the statute itself provides him fair notice. Dwyer is not being prosecuted because he happened to be employed at a company that broke the law. He is charged because, as alleged, he willfully caused, aided, and abetted BitMEX to violate the BSA and conspired to violate the BSA. The Indictment spends multiple paragraphs discussing the various actions that Dwyer and his co-conspirators took, including causing BitMEX not to have AML/KYC programs, encouraging BitMEX to be used by U.S. customers despite knowing that BitMEX could not do so legally without having such programs, tracking revenue derived from U.S. users, and implementing deliberately ineffective "safeguards" against U.S. users, among other things. (Indictment ¶¶ 20-29). These allegations, if proven, support the conclusion that the defendant willfully conspired to violate and willfully violated the BSA.

Indeed, the *scienter* element in this statute is an independent reason to reject the defendant's vagueness challenge. *See Riccio*, 43 F. Supp. 3d at 307. There is nothing arbitrary about prosecuting employees, who, whatever their roles, willfully violate the law.

Dwyer attempts to distinguish his conduct from that of the three co-defendants who have entered guilty pleas, but there is no requirement that every person charged in a criminal indictment

share equal criminal culpability.  Nor is it relevant that the Government did not charge other employees of BitMEX.  Dwyer is differently situated from any other employee for purposes of the charges in the Indictment, as he was the first employee at the company, he held a unique executive role, in New York, and he was responsible for overseeing BitMEX's support of and outreach to customers in the United States, despite knowing that the company claimed not to serve U.S. customers so as to avoid U.S. regulations.  In his motion, Dwyer does not even attempt to identify any similarly situated persons who were not charged.  And even if there were such employees, that would not entitle Dwyer to obtain dismissal of the Indictment, in the absence of a valid claim of selective prosecution based on a constitutionally protected category.  On the contrary, "[i]n the ordinary case, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion."  *United States v. Armstrong*, 517 U.S. 456, 464 (1996).

## II.   The Defendant Is Not Entitled to a Bill of Particulars

Dwyer moves in the alternative for a bill of particulars identifying "what steps [he] took to aid and abet the Company" in its decision not to implement an AML or KYC program.  The Government has gone to extensive lengths to provide the defendant with a host of evidentiary detail, including by charging him in a detailed Indictment, providing comprehensive, organized, electronically-searchable discovery, and continuing to engage in ongoing discussions with defense counsel.  The defendant is not entitled to additional particularity and his motion should be denied.

### A.   Applicable Law

The proper purpose of a bill of particulars under Federal Rule of Criminal Procedure 7(f) is "to provide a defendant with information about the details of the charge against him if this is *necessary* to the preparation of his defense, and to avoid prejudicial surprise at trial."  *United States*

*v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (quotation marks and citation omitted; emphasis added), *abrogated on other grounds by United States v. Marcus*, 628 F.3d 36, 41 (2d Cir. 2010). Accordingly, "[a] bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (quotations marks and citation omitted); *see United States v. Mahabub*, 2014 WL 4243657, at *2 (S.D.N.Y. Aug. 26, 2014); *United States v. Leonelli*, 428 F. Supp. 880, 882 (S.D.N.Y. 1977) ("The purpose of a bill of particulars is to apprise defendant of the essential facts of a crime.").

In exercising its broad discretion to determine whether the charges are "so general" that they require supplementing, the Court should consider not just the text of the Indictment, but also discovery and other information supplied to the defendant to date. *See United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987); *see also, e.g.*, *United States v. King*, No. 10 CR. 122 (JGK), 2011 WL 1630676, at *6 (S.D.N.Y. Apr. 27, 2011) (denying motion for bill of particulars, in part, because "not only has there been extensive discovery produced by the government, but the Government has worked with the defense to produce discovery in a form that is usable by the defense"); *United States v. Torres*,  901 F.2d at 234 (affirming denial of a bill of particulars where defendants had "been provided with a wealth of evidentiary detail from the discovery to date, including electronic intercepts, search evidence and exhaustive supporting affidavits") (internal quotation marks omitted); *United States v. Monserrate*, 2011 WL 3480957, at *4 (S.D.N.Y. Aug. 4, 2011) (denying request for bill of particulars where discovery and indictment was "sufficient to apprise the defendant of the charge" and to allow him to prepare for trial); *United States v. D'Amico*, 734 F. Supp. 2d 321, 335 (S.D.N.Y. 2010) (denying bill of particulars request where supplementary facts supplied to defense by way of letter); *United States v. Samsonov*, 2009 WL

176721, at *4 (S.D.N.Y. Jan. 23, 2009) (denying bill of particulars request where indictment and discovery materials gave defendant adequate information to prepare for trial); *United States v. Earls*, 2004 WL 350725, at *4-5 (S.D.N.Y. Feb. 25, 2004) (denying motion for bill of particulars in fraud case where, among other things, Government had "furnished the defendant with voluminous discovery"); *United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001) (denying bill of particulars request in stock fraud case where indictment was 15 pages long and substantial discovery had been provided); *United States v. Henry*, 861 F. Supp. 1190, 1198 (S.D.N.Y. 1994) ("In determining whether to grant a motion requesting a bill of particulars, the Court must ascertain whether the information sought has been provided elsewhere, such as through pre-trial discovery, voluntary disclosure by the government, or the indictment itself."); *United States v. Hayes*, 20 Cr. 500 (JGK) (November 23, 2021 hearing) at 15 (denying motion for bill of particulars, *inter alia*, because "the government has produced extensive discovery, including witness interviews that it was not required to produce and extensive other discovery that is responsive to the defendants' questions in the motion for a bill of particulars, including specific responses to many of the defendants' requests for particulars.").

Although the Government cannot provide "mountains of documents to defense counsel" as a substitute for a bill of particulars where one would otherwise be required, *see Bortnovsky*, 820 F.2d at 575; *United States v. Nachamie*, 91 F. Supp. 2d 565, 571 (S.D.N.Y. 2000), the provision of voluminous discovery in combination with some guidance about what is most relevant can vitiate a need for further particulars, *see, e.g.*, *United States v. Kazarian*, 2012 WL 1810214, at *25 (S.D.N.Y. May 18, 2012); *United States v. Mandell*, 710 F. Supp. 2d 368, 385 (S.D.N.Y. 2010) (denying request for particularization of alleged misrepresentations where the indictment was 34 pages long and Government had provided voluminous, organized discovery); *Hayes*, 20 Cr. 500

(November 23, 2021 hearing) at 15.  In no event should volume of discovery alone warrant a bill of particulars; "[w]hile [a] [c]ourt may sympathize with counsel's task of reviewing a large quantity of materials that continue to be produced," that concern is addressed by granting the defense sufficient time in which to conduct the review in advance of trial.  *See United States v. Levy*, 2013 WL 664712, at *13 (S.D.N.Y. Feb. 25, 2013); *see also King*, 2011 WL 1630676, at *6 (voluminous discovery "is not a concern that a bill of particulars is designed to address").

Bills of particulars would undoubtedly be helpful to the defense in any case.  But "the law does not impose upon the Government an obligation to preview its case or expose its legal theories," *Leonelli*, 428 F. Supp. at 882, and therefore "[t]he ultimate test must be whether the information sought is *necessary*, not whether it is helpful." *United States v. Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001) (emphasis added); *Mahabub*, 2014 WL 4243657, at *2 ("The purpose of a bill of particulars is to ensure that a defendant has the information necessary to prepare a defense, not to turn over all information that would aid the defendant."); *United States v. Rittweger*, 259 F. Supp. 2d 275, 292-93 (S.D.N.Y. 2003) (denying bill of particulars request as "an impermissible attempt to compel the Government to provide the evidentiary details of its case") (citation and quotation marks omitted).

A bill of particulars should not be misused to compel the Government to disclose "the manner in which it will attempt to prove the charges, the precise manner in which the defendant committed the crimes charged, or a preview of the Government's evidence or legal theories." *United States v. Sattar*, 314 F. Supp. 2d 279, 318 (S.D.N.Y. 2004), *aff'd sub nom. United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009).  Applying these principles, courts in this district routinely deny motions for bills of particulars that are, at bottom, demands for additional details of the manner in which the offense was committed or how the Government intends to prove its case at

trial. *See, e.g., United States v. Akhavan*, No. S3 20-CR-188(JSR), 2020 WL 2555333, at *2 (S.D.N.Y. May 20, 2020) (rejecting "requests [that] are simply an attempt to pin the Government to particular evidentiary details."); *United States v. Carroll*, No. 19 CR 545 (CM), 2020 WL 1862446, at *25 (S.D.N.Y. Apr. 14, 2020); *United States v. Middendorf*, No. 18-CR-36 (JPO), 2018 WL 3956494, at *3 (S.D.N.Y. Aug. 17, 2018); *see also Mitlof*, 165 F. Supp. 2d at 569 (bill of particulars not proper to force the Government to provide "the manner in which it will attempt to prove the charges, the precise manner in which the defendant committed the crime charged, or a preview of the Government's evidence or legal theories."); *see also Torres*, 901 F.2d at 234 ("'Acquisition of evidentiary detail is not the function of the bill of particulars.'") (quoting *Hemphill v. United States*, 392 F.2d 45, 49 (8th Cir. 1968)); *Hayes*, 20 Cr. 500 (November 23, 2021 hearing) at 16 ("Moreover, the defendants' specific requests seek evidentiary detail and the manner in which the government will attempt to prove its case, which the government is not required to provide in a bill of particulars."). The "'wheres, whens and with whoms'" are "beyond the scope of a bill of particulars." *Mitlof*, 165 F. Supp. 2d at 569 (citing *Torres*, 901 F.2d at 233-34); *see also, e.g., D'Amico*, 734 F. Supp. 2d at 335 ("'A bill of particulars is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial.'") (quoting *United States v. Gibson*, 175 F. Supp. 2d 532, 537 (S.D.N.Y. 2001)); *United States v. Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003) ("A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant, or disclose its legal theory."); *Henry*, 861 F. Supp. at 1197 ("This instrument should not function to disclose evidence, witnesses, and legal theories to be offered by the Government at trial or as a general investigative

tool for the defense.").

There are good reasons why bills of particulars are warranted only where the allegations in the indictment, as supplemented by discovery and otherwise, are so general as to render it impossible to prepare a defense. Because "a bill of particulars confines the Government's proof to particulars furnished," it can "restrict unduly the Government's ability to present its case." *Henry*, 861 F. Supp. at 1197. Moreover, the Government's provision of particulars tantamount to an itemized preview of its proof creates the very real danger that a defendant will "tailor [his] testimony to explain away the Government's case." *Henry*, 861 F. Supp. at 1197. These concerns animate the rule that "if the defendant has been given adequate notice of the charges against [him] and can prepare fully for trial with reasonably diligent efforts, the Government cannot be required to disclose additional details about its case." *Id.*

## B. Discussion

There is no basis for a bill of particulars in this case. The Indictment itself, which contains 29 paragraphs of detailed speaking allegations and outlines the factual basis underlying the charged conspiracy and substantive offense, provides a sufficient basis to deny the defendant's motion in its entirety. *See, e.g.*, *Hayes*, 20 Cr. 500 (November 23, 2021 hearing) at 16 ("Moreover, the defendants' specific requests seek evidentiary detail and the manner in which the government will attempt to prove its case, which the government is not required to provide in a bill of particulars."); *United States v. Bonventre*, 646 F. App'x 73, 79 (2d Cir. 2016) ("[E]videntiary detail is not the function of the bill of particulars. . . . . Particulars are necessary only where indictment charges are so general that they do not advise the defendant of the specific acts of which he is accused.") (internal quotation marks omitted); *Ferrarini*, 9 F. Supp. 2d at 299 (denying bill of particulars where "indictment alone . . . discloses sufficient information to inform the defendants adequately of the charges against them").

The Government's substantial discovery productions, including provisions of the statements of more than 20 potential witnesses far in advance of any disclosure deadline under *Giglio* or the Jencks Act, further militates against the defendant's motion. *King*, 2011 WL 1630676, at *6; *Hayes*, 20 Cr. 500 (November 23, 2021 hearing) at 15. And the Government's further provision of information to defense counsel in its November 12, 2021 Letter is yet another reason to deny his motion. *E.g. Kazarian*, 2012 WL 1810214, at *25. That letter identified specific documents produced in discovery that directly answered specific questions raised by the defense, including internal BitMEX documents that the defendant was aware of during the relevant time period that list BitMEX users who were using the trading platform from within the United States, documents that identify and provide details about the three U.S.-based customers described in the Indictment who the defendant and his co-defendants knowingly allowed on the platform, and documents that detail the defendant's knowledge that customers were using virtual private networks to evade BitMEX's supposed controls. *See, e.g.,* November 12, 2021 Letter at 4 (citing US_00173875 - US_00173878) (a specific internal communication, which defendants Hayes, Delo, and Dwyer all reviewed and discussed, in which a BitMEX employee stated that a U.S.-based customers was "openly tell[ing] Americans on twitter and his website to use a [virtual private network] to sign up for BitMEX,"); *see also* Indictment ¶ 28 (defendants "caused BitMEX to take no steps to restrict access of BitMEX via" virtual private network). These disclosures are more than sufficient to provide the defendant with adequate information to prepare for trial, and the request for a bill of particulars is merely an improper attempt to restrict the scope of the Government's proof at trial.

Dwyer's argument that he must be furnished with additional details of how he "aided and abetted" the BSA violations at issue is a classic example of fishing for further "evidentiary detail,"

23

which "is not the function of the bill of particulars." *Bonventre*, 646 F. App'x at 79. Dwyer's request is similar to types of requests that are routinely denied. *See United States v. Helbrans*, 547 F. Supp. 3d 409, 432 (S.D.N.Y. 2021) ("Demands for information with respect to where, when, and with whom the Government will charge the defendant with conspiring are routinely denied. Nor are defendants entitled to (1) information regarding how the Government alleges the defendant performed acts in furtherance of the conspiracy, or (2) more specific dates on which the alleged illegal conduct occurred."). Indeed, Dywer cites no case in which a court has ordered the Government to provide all the details of how a defendant aided and abetted a crime. In this context in particular, where the gravamen of the allegations in the Indictment are that Dwyer caused, aided and abetted, and conspired to cause BitMEX to fail to take the necessary steps to implement a compliant AML program, which were decisions he and the Company made every day for years, requiring the Government to provide detail about every relevant act and failure to act by Dwyer in furtherance of the offense would improperly restrict the Government's proof at trial. *Accord* 31 U.S.C. § 5322(c) (for BSA violations "a separate violation occurs for each day the violation continues and at each office, branch, or place of business at which a violation occurs or continues.").

Dwyer also argues that the Indictment contains inaccurate allegations as to him, but the sole example he provides is the allegation in paragraph 21 of the Indictment that "the defendants caused the Company to formally incorporate in the Seychelles." Because Dwyer joined the Company after it was incorporated in the Seychelles, he did not participate in this decision, as the Government informed defense counsel in its November 12, 2021 letter. But as described further *supra*, Dwyer played an important role at BitMEX and had authority over various functions, as described in many other detailed paragraphs of the Indictment, in the Government's November 12,

2021 letter, and as is clear throughout the voluminous discovery. Tellingly, Dwyer's motion focuses on the Seychelles allegation and repeatedly denies that he played a role in that decision, while saying nothing about the numerous additional particular allegations about his conduct in causing, aiding, and abetting BitMEX's BSA violations.

None of the cases cited by Dwyer approved a bill of particulars that was even remotely analogous to the one he requests in this case, in which he expressly demands general "details" about his aiding and abetting.  Dwyer Motion at 20.   For instance, the defendant cites *United States v. Ralston*, 19 Cr. 744, 2021 WL 5054464, at *1-*2 (S.D.N.Y. Nov. 1, 2021), in which the court granted defendants' request for a "narrow" bill of particulars regarding conduct taking place within statute of limitations.  But the court in *Ralston* went on to explain that it would be improper for a defendant to request "detailed evidence about the conspiracy" or demand that the Government "particularize all of its evidence."  *Id.*; *see also United States v. Savin*, 00 Cr. 45, 2001 WL 243533, at *4-*6 (S.D.N.Y. Mar. 7, 2001) (granting portion of defendant's request seeking particulars about the "means and methods" of an alleged mail and wire fraud conspiracy where the nature of the scheme was unclear from the Indictment, but rejecting the defendant's request for particulars about "his alleged role" in the scheme and his knowledge of particular transactions, because these requests sought "evidentiary detail beyond what is required to provide adequate notice of the charges …, and would, in effect, give him a preview of the government's case before trial").  Similarly, the Court should reject the defendant's fishing expedition for "details" in this case.

**CONCLUSION**

For the reasons set forth above, the Court should deny the defendant's motion to dismiss and motion for a bill of particulars.


Dated: New York, New York
       July 15, 2022

                                    Respectfully submitted,

                                    DAMIAN WILLIAMS
                                    United States Attorney

                        By:    _____/s/_____
                                    Samuel Raymond
                                    Thane Rehn
                                    Assistant United States Attorneys
                                    (212) 637-6519/2354